IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | | |
|---|---|---|
| John Michael Woodruff, | § | |
|     Petitioner | § | CASE NUMBER: |
| | § | 7:16-CV- 0008 |
|     v. | § | |
| | § | |
| Kayla Crockett, | § | |
|     Respondent | § | |

---

## PETITIONER'S BRIEF IN SUPPORT
## OF WRIT OF HABEAS CORPUS

---

### JURISDICTION

The U.S. District Court has jurisdiction to grant this petition for writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Petitioner asserts a Sixth Amendment violation in satisfaction of 28 U.S.C. §§ 2254(a) and (d)(1). Petitioner asserts **actual innocence** in supersedence of 28 U.S.C. §§ 2254(b), (c), and (e). To wit:

> where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default […] to see that federal constitutional errors do not result in the incarceration of innocent persons. ***McQuiggin v. Perkins***, 569 U.S. ___ (2013), slip op, at 8; see also ***House v. Bell***, 547 U.S. 518 (2006), at 537-538, and ***Schlup v. Delo***, 513 U.S. 298, at 324.

In cases of actual innocence, "the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a

fundamentally unjust incarceration" (*Schlup*, at 315). Actual innocence thus stands as a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered" (*id*, at 315). To this end,

> if [the petitioner] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner **should** be allowed to pass through the gateway and argue the merits of his underlying claims. (*Schlup*, at 316; emphasis added)

In short, a showing of actual innocence affords "a meaningful avenue by which to avoid a manifest injustice" (*House*, at 537; *Schlup*, at 327; *McCleskey v. Zant*, 499 U.S. 467, at 494). Moreover, the actual innocence gateway "survived AEDPA's passage intact and unrestrained" (*McQuiggin*, slip op, at 13).[1]

Notwithstanding such precedent, Petitioner can and does aver circumstances colorable under 28 U.S.C. § 2254(b). First, direct appeal of the trial court's judgment is presently stayed by O.C.G.A. § 5-6-36. Second, even if direct appeal were not so stayed, local and state backlogs are such that Petitioner might reasonably complete his three year sentence before exhaustion could occur. Therefore, any cognizable state remedy is both *absent* and *ineffective* to the innocent Petitioner.[2]

---

[1]  Though the gateway has been ratified in various circumstances, it is not limited thereunto (see *McQuiggin*, at 1-2, 8-9, 13-14). While a pre-exhaustion exception may well be a case of first impression, Petitioner maintains that *McQuiggin*'s untimely (late) exception properly gives rise to Petitioner's untimely (early) exception.

[2]  Here, speaking specifically to the language of 28 U.S.C. § 2254(b)(1): "unless it appears that [...] there is an *absence* of available State corrective process; <u>or circumstances exist that render such process *ineffective* to protect the rights of the applicant</u>." (emphasis added)

## INTRODUCTION

Petitioner John Woodruff was prosecuted for two state offenses: terroristic threats and acts (O.C.G.A. § 16-11-37) and disorderly conduct (O.C.G.A. § 16-11-39). Petitioner asserts a claim of actual innocence based on an audio recording which was tendered to an investigator by a third party two days after the alleged event transpired. This recording was received into evidence and obtained in discovery, but was not presented at trial due to constitutional error. (see *Schlup v. Delo*, 513 U.S. 298, at 301, 324; *House v. Bell*, 547 U.S. 518, at 537).

Because Petitioner asserts grave constitutional error, "[his] conviction may not be entitled to the same degree of respect [as a conviction] that is the product of an error-free trial" (*Schlup*, at 316; *House*, at 537). That said, Petitioner need not factually prove innocence because his burden is <u>not</u> the "clear and convincing" *Sawyer* standard (*Schlup*, at 323-324, 326; *House*, at 539). Rather, a "petitioner's burden at the [actual innocence] stage is to demonstrate that more likely than not […] any reasonable juror would have reasonable doubt." (*House*, at 538 ff.7)

The unintroduced audio recording proves that Petitioner absolutely did not utter the speech of the second count of the indictment. Petitioner represents that this recording also disproves the first count of the indictment, or in the alternative so substantively establishes reasonable doubt that a jury "would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative." (*House*, at 537, 541, 569; see also *Schlup*, at 317)

Actual innocence is not a ground for relief but rather a "gateway" for federal contemplation of an otherwise barred petition. Petitioner must therefore accompany his actual innocence claim with a Constitutional violation that resulted in his confinement (*McQuiggin*, slip op, at 8; *Herrera v. Collins*, 506 U.S. 390, at 404-405). To this end, Petitioner avers ineffective assistance of counsel in violation of his Sixth and Fourteenth Amendment protections.[3] Petitioner further avers violation of his Fifth and Fourteenth Amendment protections when the State, in its closing arguments, referenced Petitioner's election not to testify.

It is thoroughly established that the right to counsel is also the right to "the effective assistance of competent counsel" (*McMann v. Richardson*, 397 U.S. 759 (1970), at 771). The easiest determinant of ineffective assistance is actual denial of counsel at a critical stage (*U.S. v. Cronic*, 466 U.S. 648). However, **constructive denial** occurs if there is an absence of "counsel acting in the role of an advocate" or a failure "to require the prosecution's case to survive the crucible of meaningful adversarial testing" (*Cronic*, at 656). Constructive denial may also occur when "the process loses its character as a confrontation between adversaries" (*id*, at 656-657).

At trial, Petitioner's counsel introduced no evidence, called no witnesses, raised only two objections, conducted a scant three-minute questioning of one witness, and waived cross-examination of the State's remaining three witnesses.

---

[3]  This was also the error asserted *in McQuiggin v. Perkins*, 569 U.S. ___ (2013), *House v. Bell*, 547 U.S. 518, and *Schlup v. Delo*, 513 U.S. 298.

This completely fails the character of the intelligent cross-examination described in *Davis v. Alaska*, 415 U.S. 30. Petitioner alleges that trial counsel's performance was "so inadequate that, in effect, no assistance of counsel [was] provided" (*Cronic*, at 654 ff.11).

Apart from an actual or constructive denial, **actual ineffectiveness** may be shown when counsel commits serious error and such error prejudices the outcome (*Strickland v. Washington*, 466 U.S. 668, at 687). Actual ineffectiveness may also exist "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome" (*Strickland*, at 694). In such cases, it is only necessary to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different [where] reasonable probability is the probability sufficient to undermine confidence in the outcome" (*id*, at 694).

Petitioner asserts that trial counsel's dereliction of the adversarial process and abandonment of the second count are absolute *Cronic* errors as well as concurrent *Strickland* errors. In a more conventional sense, Petitioner will argue error and prejudice in trial counsel's refusal to cross-examine witnesses, refusal to raise appropriate objections, reckless jury statements, mishandled evidence, and mangled motion for directed verdict. Finally, Petitioner argues that his trial counsel acted with disregard for the Rules of Professional Conduct, willfully deprived

Petitioner of his confrontation safeguard, and may have conducted Petitioner's defense under conflict or duress.

## STATEMENT OF FACTS [4]

At the time of the events in question, Petitioner John Woodruff was employed as a tenure-track Assistant Professor at Valdosta State University. Wednesday, June 6, 2012 was the first day of the second summer term. After a full day of meetings, teaching, planning, and grading, Woodruff left campus between 8:00 p.m. and 9:00 p.m. Upon arriving to his gated community, Woodruff's entry was blocked by a stranger, eventually identified as Marty Aaron Bruce. Bruce was occupying a 2003 Chevrolet Silverado 2500HD. Woodruff was driving a 2001 Toyota Corolla.

After Bruce demonstrated an ongoing intent to obstruct ingress, Woodruff pulled to the location of the visitor call box which was somewhat proximate to the passenger side of Bruce's truck. Bruce rolled down a passenger window and began cursing at Woodruff. Bruce claimed he was there to visit a female resident. Woodruff attempted to explain the guest entry procedure to Bruce at which point Bruce stated "I know, I know what to do. I know what to do, dipshit." The colloquy then took a more heated tone. After a few additional exchanges (including

---

[4] As the State has yet to furnish *pauperis* transcripts to Petitioner, citations to the record cannot be made. However, Petitioner is mindful that the district court will itself review the state record once available. The district court may therefore be assured of Petitioner's candor here.

Woodruff telling Bruce to "suck [his] dick"), Bruce backed his truck away from the gate. Woodruff then advanced and used his wallet card to open the gate. Bruce thereupon attempted to follow Woodruff onto the property at which point Woodruff stopped and instructed Bruce to back up lest the gates close on his truck.

At some point the female resident, Bradhie Melton, exited her residence and walked toward the entrance with her key fob to grant admittance to Bruce. She and Woodruff also exchanged heated words. Woodruff then drove to his residence and went inside. Around this time, another resident, Sean Bolan, and his guest, Michael Varnum, approached the entrance and initiated a conversation with Bruce.

Bruce subsequently telephoned the sheriff's department to ask which supervisors were working. Bruce then called Lieutenant Mark Terrell who stated that he was occupied, but that he would send a corporal to Bruce's location. Bruce then telephoned Corporal Thomas Altman. At no time did Bruce telephone 911 and no call for service was ever dispatched.

Altman met with Bruce, Melton, Varnum, and Bolan while waiting for Terrell to arrive. Upon arriving, Terrell met with Bruce, and then Terrell and Altman both went to Woodruff's door. Woodruff stated that there had been a suspicious individual trying to enter the property, and that the events were presumably recorded by management's security cameras. A few minutes later Terrell was called to the scene of a crash involving another deputy, though before

leaving, Terrell ordered Altman not to arrest Woodruff. Altman left Woodruff's door shortly thereafter and spoke further with Bruce and Melton. Altman subsequently returned to Woodruff's door to solicit a written statement, which Woodruff declined. Altman then announced to Woodruff that, despite his order to the contrary, Altman would return in the morning to "pick you up." After further cajoling, Woodruff tendered a written statement setting forth his suspicions as to the other driver's actions and again urging a review of management's surveillance video.

The following morning, Altman had a day-shift deputy obtain an arrest warrant from magistrate court. By sheer Providence, Woodruff was not in his office when multiple police details converged on his building. But learning of the escalation, Woodruff obtained legal representation from John D. Holt who quickly secured bond from the magistrate court. Deputies then served the warrant at Holt's office. Woodruff was processed and released a few hours later. The following month the district attorney sought and obtained an indictment for the charge of terroristic threats and acts. At that time, the district attorney pursued a second indictment for disorderly conduct, which she obtained. (EXHIBIT A, PAGE 15)

On December 11, 2012, a hearing was held to decide defense motions to suppress and to assert immunity pursuant to O.C.G.A. § 16-3-21, *et seq*. At this time Terrell confirmed that cruiser video existed which should have been included

in discovery. Specifically, the withheld video contained witness, victim, and suspect statements from the time of the alleged events. The State finally produced Terrell's video in February 2013. Statements in this video revealed that Altman also had video, and after repeated further discovery requests, Altman's video was finally produced in June 2013. Altman's video then pointed to still more video from another deputy which was never produced. Holt moved for re-hearing in light of the untimely production, but whenever the case appeared on the quarterly motion docket, the State objected that the presiding judge was not the December 2012 judge. In this way, no re-hearing occurred.

Woodruff's case appeared sporadically on trial calendars for 2013 and 2014, at times bring ranked highly while at other times not appearing on the calendar at all. Unable to work in any of his qualified fields due to the felony indictment, Woodruff teetered on the verge of bankruptcy as 2014 drew to an end and he had no ability to pay for Holt's services. Holt moved and obtained leave to withdraw as counsel. In February 2015 the trial court appointed representation from the Office of the Public Defender. Woodruff promptly met with Wade Krueger to discuss the case. Woodruff briefed Krueger on the prior filings and issues. Krueger refused to file any pre-trial motions nor to continue with a re-hearing of the 2012 motions.

When the case was finally called for trial in May 2015, the State announced that Altman had left the sheriff's department and moved to Atlanta. And though

Altman was willing to testify, it was not a convenient month for him. It was then learned outside of court that Bruce likewise left the State of Georgia following settlement of an unrelated 42 U.S.C § 1983 action (7:13-CV-162-HL).

Woodruff's trial was finally held on July 21, 2015. The State first called Marty Bruce. Bruce testified that he was there to deliver food to Melton. Bruce previously had Melton's wallet card, but having returned it a few weeks prior, he phoned her to open the gate. Bruce called Melton several times which she failed or refused to answer. Bruce alleges that Woodruff aggressively maneuvered his vehicle beside Bruce's truck. Bruce testified that Woodruff was in a crazed frenzy and threatened to "put a cap in [his] ass." It was Bruce's opinion that the phrase connoted bodily harm but not necessarily murder. Bruce testified with emphatic certainty that Woodruff maintained a concealed carry permit and had a handgun on his person at all times.

In cross-examination, Krueger asked if Bruce was aware of an audio recording that captured his colloquy with Woodruff. Bruce testified that at the conclusion of a call which he had placed to Melton, Bruce failed or forgot to terminate the call after leaving an initial message on her voice mail and in this way the colloquy with Woodruff had been recorded.[5] Krueger questioned Bruce about whether or not Bruce had used profanity toward Woodruff, but Krueger never

---

[5] Melton presented this voicemail to a sheriff detective two days later. A duplicate recording was made, logged in evidence, and produced (albeit untimely) in discovery.

probed inconsistencies and contradictions between the voicemail and Bruce's written and video statements. Krueger also did not explore Bruce's claim that Woodruff carried a handgun (Woodruff in fact did not own a handgun and had stated as much to Altman). Krueger proffered no evidence and his cross-examination lasted approximately three minutes.

The State next called Michael Varnum. Varnum testified that he did not live at the apartment complex but rather was visiting his friend Sean Bolan. When presented with a satellite image, Varnum was not initially able to identify Bolan's apartment. Varnum requested to be shown the location of the entrance gate and he was then able to identify Bolan's building. Varnum testified that he and Bolan were "hanging out" on the rear balcony when they became aware of a disturbance below. Varnum testified that Bruce's truck was blocking the gate. Varnum also testified that he could not recall any actual profanities used, but only that profanity had been used. Krueger waived cross-examination.

The State next called Sean Bolan. Bolan testified that the rear of his apartment "overlooked" the entrance gate. Bolan testified that there had been a disturbance which prompted him and Varnum to exit through the opposite side of the apartment and walk around to the gate. Bolan testified that by the time he and Varnum arrived, Woodruff's car had already entered the property and was stopped just inside the gate. Krueger again waived cross-examination.

The State next called Bradhie Melton. Melton testified that she and Bruce had once been in an amorous relationship. Melton testified that she knew Woodruff to be a neighbor who at the time was a professor at Valdosta State University. Melton also testified that she had not witnessed any of the colloquy between Bruce and Woodruff. Yet again, Krueger waived cross-examination. The State rested.

Outside of the jury's presence, Krueger moved for a directed verdict as to the first count of the indictment pursuant to *Milner v. State*, 297 Ga. App. 859, (2009). The trial court denied Krueger's motion and ruled alternatively that it would issue a limiting instruction. Krueger commenced no discussion as to the character or scope of such limiting instruction.

When the court resumed, Krueger called no witnesses, tendered no evidence, and proffered no special jury instructions. Since no jury charge is contained in the clerk's record, it is presumed that the standard pattern charge was given. The jury returned verdicts of guilt on both counts.

On July 23, 2015 Woodruff dismissed Krueger. Woodruff noticed the court and contemporaneously moved for appointment of new counsel and new trial on jurisdictional grounds under the Sixth and Fourteenth amendments. The State filed no responses and the trial court never ruled on Woodruff's motions.

On August 21, 2015 attorney Guyton O. Terry, III entered his appearance as sentencing counsel by appointment of the Georgia Public Defender Standards

Council.[6] Sentencing was held on September 11, 2015. Woodruff was sentenced to thirty-six months of probation on the first count and twelve months of probation for the second count. Woodruff was fined $1,000, assessed costs of $600, assessed probation supervision costs of $1,152 and ordered to perform eighty hours of community service.

Sentencing having been completed, Terry moved to withdraw as counsel on September 18, 2015. Woodruff began contacting various divisions of the Georgia Public Defender Standards Council to identify his appellate counsel. The matter eventually reached the desk of James Stokes who advised that appellate counsel had not been assigned due to oversight. He requested Guyton Terry re-appear and tender a skeletal motion to stay the tolling of the period to file notice of appeal.

At this same time, Woodruff filed a *habeas* petition in the United States District Court. Woodruff averred Constitutional error under 28 U.S.C. § 2254(a) and special circumstances under 28 U.S.C. § 2254(b)(1). Woodruff subsequently moved the U.S. District Court for leave to amend his habeas petition with a more sufficient articulation of the *McQuiggin* holding, or, in the alternative, to dismiss the petition without prejudice. During this time Woodruff also presented a *habeas* petition to the Superior Court of Lowndes County together with a state application

---

[6]  Terry (a private practice attorney) was so appointed pursuant GPDSC's conflict protocol. See *Christeson v. Roper*, 574 U.S. __ (2015), slip op at 5-6 as to ratification of conflict.

for leave to proceed *in forma pauperis*.[7] Presently, the Superior Court of Lowndes County withholds adjudication of Woodruff's *pauperis* application and his state *habeas* petition therefore remains undocketed.

On October 30, 2015 the U.S. District Court dismissed Woodruff's habeas petition without prejudice for non-exhaustion (7:15-CV-00184-HL-TQL, Doc 5). Woodruff now presents this jurisdictionally-sound *habeas* petition under the **actual innocence** gateway of *McQuiggin v. Perkins*, 569 U.S. __ (2013), *House v. Bell*, 547 U.S. 518 (2006) and *Schlup v. Delo*, 513 U.S. 298 (1995).

[CONTINUED NEXT PAGE]

---

[7] The civil/habeas filing fee in Lowndes County is $200. Petitioner submits that his active chapter 7 bankruptcy proceeding (15-70800-JTL) substantiates the economic burden that such fee would impose.

## EXHIBIT A – PETITIONER'S INDICTMENT

**IN THE SUPERIOR COURT OF LOWNDES COUNTY**

**STATE OF GEORGIA**

The Grand Jurors selected, chosen and sworn for the County of Lowndes to wit:

1. William Michael Dame, Foreperson
2. Hollis Mike Courson, Vice Foreperson
3. Brooke Eileen Blanton, Secretary
4. Kelly Colson Lupton
5. Jennifer J. Sands
6. Gary T. Weller
7. Harold Dean Ashmore
8. Wayland Hendry Blalock
9. Hubert Daniel Cashwell
10. William Ray Fender
11. Calvin Graham, Jr.
12. Brenda Lane Smith

13. Julie Anne Taylor
14. James Rufus Ward
15. Leslie Ann Williams
16. Doc Freeman Baldwin
17. Tiffany Elise Courington
18. Sammie Lee Loud
19. Shawn Alan O'Conner
20. Keith Bradley Rentz
21. Roscoe James Thornhill
22. April Lee Brumfield
23. Joshua Richard Orr
23A. Tina Deanne Repass
23B. Mike William Stalvey
23C. Clark Bradford Barrett

### COUNT 1

The Grand Jurors aforesaid, on their oaths aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **JOHN MICHAEL WOODRUFF** with the offense of **Terroristic Threats** for that the said accused in Lowndes County, Georgia, **on or about the 6th day of June, 2012**, then and there did threaten to commit murder, a crime of violence, with the purpose of terrorizing Marty A. Bruce, contrary to the laws of said State, the good order, peace and dignity thereof.

### COUNT 2

The Grand Jurors aforesaid, on their oaths aforesaid, in the name and behalf of the citizens of Georgia, charge and accuse **JOHN MICHAEL WOODRUFF** with the offense of **Disorderly Conduct** for that the said accused in Lowndes County, Georgia, **on or about the 6th day of June, 2012**, then and there did, without provocation, in the presence of Marty A. Bruce, use to said person opprobrious and abusive words, to-wit: "Get the fuck out of the way you stupid motherfucker;" I don't care who the fuck you are waiting for," said words, which by their very utterance tend to incite an immediate breach of the peace, and are words which as a matter of common knowledge and under ordinary circumstances will, when used to another person in such other person's presence, naturally tend to provoke violent resentment and are words commonly called "fighting words", contrary to the laws of said State, the good order, peace and dignity thereof.

## ARGUMENT

To better understand the unfolding of events, it is necessary to know that Bruce was employed at the time as a deputy sheriff (though he was off-duty, in his personal truck, and wearing ordinary civilian clothing). Knowing this explains Bruce's special access to the sheriff's office, Lieutenant Terrell, Corporal Altman, and the biased investigation that ensued. Nevertheless, the investigation was conducted in direct contravention of the department's internal operating procedures as well as its inter-agency agreement with the City of Valdosta.

There has been long-standing jurisdictional strife between Lowndes County and the City of Valdosta. After the contentious consolidation of their dispatch operations in 2010, the *Valdosta Daily Times* printed a brief article addressing jurisdiction.[8] According to Valdosta Police Chief Brian Childress, "[i]f a citizen calls 911 for law-enforcement service within the city limits, they (911) are to, and know to, dispatch a city officer." Similarly, Sheriff Chris Prine affirmed, "[i]f we receive non-emergency city calls, we will notify the city. […] We are here to provide a service to the community as a whole, but we try not to infringe on the city's cases." This protocol was not followed.

Discovery materials show that no call was placed to 911 and that Bruce, Terrell, and Altman all communicated by cellular telephone. This shows that there

---

[8]  Castro, Dawn. "Reader asks about law enforcement jurisdiction." *Valdosta Daily Times*. 14 March 2011.

was no emergency situation warranting deviation from operating procedures, and that deputies had opportunity but chose not to notify the city. To the degree that Bruce "felt in fear for [his] life," it is inconsistent that he never drove away, never summoned immediate help, but waited patiently for his department to respond.

For the Valdosta residents serving on the jury, disregard of protocol would have been an enormous credibility and objectivity issue, and they likely would have wondered if city officers would have even charged Petitioner. But regardless of a given juror's residency, all would have wondered why the sheriff's department ignored the greater propriety of seeking an independent agency's investigation, and if propriety and procedure had been ignored in order to shield Bruce from arrest and/or prosecution.[9] Still, every juror would have struggled with the patrol videos in which Bruce uses vociferous profanity, often contradicts himself, and stumbles and stutters so profoundly that one would conclude that Bruce either was intoxicated or was fabricating the account as he gave his statement.

---

[9] For example, disorderly conduct, loitering, public obstruction, or public intoxication. Disorderly conduct is committed when, without provocation, one person "uses to or of another person in such other person's presence, opprobrious or abusive words […] when used to or of another person in such other person's presence, naturally tend to provoke violent resentment." Loitering is committed when a person "is in a place at a time or in a manner not usual for law-abiding individuals under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity." Public obstruction is committed when a person "purposely or recklessly obstructs any highway, street, sidewalk, or other public passage in such a way as to render it impassable." Public intoxication is committed when a person "appear[s] in an intoxicated condition […] made manifest by boisterousness, by indecent condition or act, or by vulgar, profane, loud, or unbecoming language." (O.C.G.A. §§ 16-11-39, 16-11-3, 16-11-43, 16-11-41; respectively)

The cruiser videos memorialize Petitioner's plain statement to Terrell and Altman that he had not recognized the truck or the driver, and his suspicions as to the driver's conduct (i.e. belligerence, claims of visiting a female resident, willful noncompliance with visitor procedure). It is also memorialized that Petitioner plainly denied owning any handguns. Further still, the cruiser video memorializes Varnum's statement that he and Bolan "didn't really see so much" because the balcony was secluded by dense summer foliage and, moreover, that they had been absent for an indeterminate interval while they "came out to see what was going on." Later, a colloquy between Bruce and Altman asserts a strong and sickening suggestion that Bruce coached Varnum's and Bolan's statements prior to Altman's arrival. Altman even acknowledges that Woodruff and Bruce both wanted Altman to review management's surveillance video. However, Altman never sought to review or obtain that evidence. This failure left the voicemail as the sole—and unforeseeable—evidence of Petitioner's innocence.

To any objective evaluator, the absurdity of the investigation generates substantial concerns. All this, of course, being in addition to the voicemail recording itself. While trial counsel undoubtedly would propound a plausible strategy for not impeaching Bruce's conduct, not refuting Varnum and Bolan as witnesses, not probing conflicts of interest, and not calling Altman and Terrell as

witnesses, each such plausibility is countervailing to the other, and taken as a whole, is entirely incongruous with the facts and with the evidence.

The first count of the indictment specifically charged that Petitioner "threaten[ed] to commit murder […] with the purpose of terrorizing Marty A. Bruce." Unfortunately, the voicemail—for reasons of poor acoustics—is not at all times perfectly intelligible and there are conflicting hearings of the specific locution which is alleged to express the threat. But even supposing that all jurors were to agree in their hearings of the locution, the intelligible portions themselves are such that no juror would have been able to adduce the alleged purpose of "terrorizing" nor the alleged intent of "murder." Still, *House v. Bell* holds that "[t]he court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors" (*id*, at 538). Thus the requirement for opening the innocence gateway is elegantly simple: "demonstrate that more likely than not […] any reasonable juror would have reasonable doubt" (*id*, at 538 ff7; emphasis added).[10]

## GROUND I: ACTUAL INNOCENCE

The core holding of *Schlup v. Delo*, 513 U.S. 298 (1995), is that evidence of actual innocence can bring a Constitutional claim within the "class of cases

---

[10] Simplified for readability as to *Schlup*'s ff7. The full footnote reads: "A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt--or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."

implicating a fundamental miscarriage of justice" (*id*, at 315, internal punctuation omitted). This gateway exists because "the one thing almost never suggested on collateral attack is that the prisoner was innocent of the crime" and "a prisoner retains an overriding interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated." (*Schlup*, at 321-322)

In such posture, "if a petitioner […] presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner <u>should be allowed</u> to pass through the gateway and argue the merits of his underlying claims." (*Schlup*, at 316, emphasis added).[11] Furthermore, "in appropriate cases, the principles of comity and finality that inform the concepts of cause and prejudice must yield to the imperative of correcting a fundamentally unjust incarceration." (*House*, at 536; *Schlup*, at 320; *Murray v. Carrier*, 477 U.S. 478, at 495; *Engle v. Isaac*, 456 U.S. 107, at 135; internal punctuation omitted).

While *House v. Bell* confirmed that the *Schlup* gateway survived AEDPA's passage, *McQuiggin v. Perkins* held that the gateway also reached AEDPA's statutory bars. (*id*, 569 U.S. __, slip op, at 1-2, 13-14). Reaching this conclusion, the court returned to the "fundamental miscarriage of justice exception" that

---

[11] As noted in the jurisdictional statement, the Supreme Court has applied the miscarriage of justice exception to diverse defaults, *inter alia*: abusive/successive petitions, insufficient factual development, non-compliance with state procedural rules (see discussion in *McQuiggin*, slip op, at 8; citing *Kuhlmann v. Wilson*, 477 U.S. 436; *McCleskey v. Zant*, 499 U.S. 467; *Keeney v. Tamayo-Reyes*, 504 U.S. 1; *Coleman v. Thompson*, 501 U.S. 722).

empowers federal habeas courts to ensure that "federal constitutional errors do not result in the incarceration of innocent persons." (*McQuiggin, slip op,* at 8; citing *Herrera v. Collins*, 506 U.S. 390, at 404; see also *Calderon v. Thompson*, 523 U.S. 538, at 558; *Murray v. Carrier*, 477 U.S. 478, 496; *House*, at 536-538; *Schlup*, at 326-327).

In light of the voicemail recording, Petitioner can show absolutely that he did not speak the utterances charged in the second count of the indictment. Moreover, insofar as the first count of the indictment charges a specific motive, manner, and intent, the voicemail and cruiser video are such that "any reasonable juror would have reasonable doubt" and/or "would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative" (*House*, at 538, 541, respectively; see also *House*, at 569).

Petitioner now turns to the issue of ineffective assistance of counsel. This constitutional error serves both as the basis for review (as in *McQuiggin, House,* and *Schlup*) and as cause for insufficient evidentiary development at trial (see *Keeney v. Tamayo-Reyes*, 504 U.S. 1).

## GROUND II: INEFFECTIVE ASSISTANCE OF COUNSEL

The Sixth and Fourteenth Amendments guarantee "effective assistance of competent counsel" (*McMann v. Richardson*, 397 U.S. 759 (1970), at 771) but this right is not satisfied    merely by the presence of an attorney (*U.S. v. Cronic*, 466

U.S. 648, at 654-655; *Strickland v. Washington*, 466 U.S 668, at 685). The right to assistance of counsel connotes "a reasonably competent attorney," who affords the defendant with "adequate legal assistance." (*Cronic*, at 655; quoting *McMann,* at 770 and *Cuyler v. Sullivan*, 446 U.S. 335, at 344, respectively).

The easiest determinant of ineffective assistance is actual denial or **constructive denial** of counsel which require no showing of prejudice (*Cronic*, at 659). Alternatively, **actual ineffectiveness** requires a two-prong test showing that counsel committed objectively deficient errors, and that such specific deficiency directly prejudiced the trial's outcome. In other words, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result" (*Strickland*, at 686). A petitioner could also show in aggregate that "counsel's incompetence [was] so serious that it rises to the level of a constructive denial of counsel which can constitute constitutional error without any showing of prejudice" (*Strickland*, at 702 citing *Cronic*, at 659-660).[12]

CRONIC 1: DERELICTION OF ADVERSARIAL CHARACTER

The *Cronic* test aims to "require the prosecution's case to survive the crucible of meaningful adversarial testing" and "if counsel entirely fails to subject

---

[12] Since the Eleventh Circuit does not recognize cumulative *prejudice*, it should be clarified that this type of accumulation implies cumulative *error* irrespective of prejudice.

the prosecution's case to <u>meaningful</u> adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable" (*Cronic*, at 656, 659; respectively; emphasis added).

Despite the appreciable evidence available to him (voicemail, cruiser video, written statements, photographs), Petitioner's trial counsel introduced no evidence to controvert the State's witnesses. Trial counsel cross-examined Bruce for a mere three minutes about the existence of the voicemail but then never introduced it as evidence. Thereafter, trial counsel waived cross-examination of Varnum, Bolan, and Melton. Trial counsel ignored/failed to defend the second count of the indictment, and raised only two objections during the whole of the proceedings.

As noted, Varnum and Bolan did not actually witness the colloquy. Even if they were regarded as earwitnesses, no direct testimony was elicited to establish their competence to identify the speaker of each utterance as would be required by *Patterson v. State*, 287 Ga. App. 100 (2007). The State's direct examinations also did not adduce the span of Bolan's residency nor Varnum's last visit to the property. Apart from the deteriorative effect of the intervening three years, Varnum's and Bolan's memories might well be colored by some subsequent observation in the barrenness of winter which perhaps afforded better visualization of the entry. This is precisely why defense counsel should "delve into the witness' story to test the witness' perceptions and memory" for "[c]ross-examination is the

principal means by which the believability of a witness and the truth of his testimony are tested" (*Davis v. Alaska*, 415 U.S. 308, at 316).

Varnum and Bolan were presumably not being perjurious; rather they simply misremembered (as is manifest in their mutual recollections that Bolan's balcony overlooked the gate when in fact it did not). Such human frailties are easily understood by a jury when elucidated in a professional manner, but without "meaningful adversarial testing" of the evidence and testimony, the adversarial process and the verdict it produces are "presumptively unreliable" (*Cronic*, at 659).

As for Melton—who had been amorously involved with Bruce—a cross-examination would be appropriately "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand" (*Davis*, at 316). Even a gentle cross-examination would have generated appreciable insight into Bruce's temperament, actions, and motivations which are "always relevant as discrediting the witness and affecting the weight of his testimony" (*Davis*, at 316).

In sum, trial counsel introduced no evidence, called no witnesses, raised only two objections, and waived cross-examination of Varnum, Bolan, and Melton. These failures are not cured by a scant three-minute directionless cross-examination of Bruce. Moreover, trial counsel subpoenaed no witnesses—neither Altman, nor Terrell, nor any of the agents of the residential property where

Petitioner, Melton, and Bolan had formerly resided.[13] This lack of depth does not satisfy the character of adversarial testing and fails to "marshal the evidence into a coherent whole" (*Argersinger v. Hamlin*, 407 U.S. 25, at 46). An ordinary layman would have at least attempted to attack the testimony and that a seasoned attorney failed to exercise a layman's reasonableness breaches the duty to render "effective and substantial aid" (*Powell v. Alabama*, 287 U.S. 45, at 53). Petitioner therefore submits that "performance of counsel [was] so inadequate that, in effect, no assistance of counsel [was] provided" (*Cronic*, at 654 ff.11).[14] Having shown constructive denial of counsel, no showing of prejudice is required (*Cronic*, at 659; *Strickland*, at 702).

### STRICKLAND 1: REFUSAL TO CROSS-EXAMINE WITNESSES

Petitioner restates the foregoing *Cronic* loss of adversarial character as concurrent *Strickland* error where each waiver of cross-examination is a separate prejudicial error. Additionally, the charging statute requires that "[n]o person shall be convicted under this subsection on the uncorroborated testimony of the party to whom the threat is communicated" (O.C.G.A. § 16-11-37). Knowing that Varnum and Bolan had not visually witnessed the event, were not at all times present, and

---

[13] It further appears that trial counsel never reviewed the production or motions by Petitioner's first counsel which would have ostensibly availed a defense under O.C.G.A. § 16-3-5: "A person shall not be found guilty of a crime if the act or omission to act constituting the crime was induced by a misapprehension of fact which, if true, would have justified the act or omission."

[14] This is to say, counsel should perform superiorly to a layman in order to be "assistive." See *Argersinger*, at 31; *Powell*, at 69; *Gideon v. Wainwright*, 372 U.S. 335, at 345.

were not competent earwitnesses, it is reasonable to conclude that a properly-instructed juror would have been unable to find corroboration. Failure to attack Varnum and Bolan on these issues is an error so substantial that not even an apprenticing law student would fail in this manner. This deficient performance prejudiced the proceedings by foreclosing questions of fact and of law.

### STRICKLAND 2: TRIAL COUNSEL'S JURY STATEMENTS

Petitioner extends the preceding *Strickland* cross-examination discussion as further concurrent *Strickland* error. In his opening statements, trial counsel flatly told the jury that Petitioner had threatened Bruce with a "cap in the ass," but suggested that this was substantively different than a "bullet to the brain" or a "shot to the heart" and therefore failed the "murder" characterization of the indictment. In other factual circumstances, this might be a conceivably appropriate tact for a *closing* argument if stated hypothetically in the subjunctive, but as an indicative declaration in the opening statements it betrays and disserves the client. This recklessness at the opening stage introduced a corroboration which did not otherwise exist and foreclosed any impeachment of Varnum and Bolan.

Trial counsel "owes the client a duty of loyalty," a "duty to advocate the defendant's cause," and a "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process" (*Strickland*, at 688). The facts of Petitioner's case make it clear that there would be considerable benefit and gain

in subjecting the evidence and testimony to substantial adversarial testing. Trial counsel's opening statements, however, rendered adversarial testing a nullity. Whether purposeful, miscalculated, or careless, such opening statements were so destructive as to "undermine[] the proper functioning of the adversarial process" (*Strickland*, at 686; internal punctuation omitted). This in turn introduced prejudice because without adversarial character, "the trial cannot be relied on as having produced a just result" (*Strickland*, at 686).

STRICKLAND 3: MISHANDLED EVIDENCE

Bruce's written statement and testimony comprised the sole evidence for the second count of the indictment; the voicemail, however, is indisputable proof that Petitioner did not utter the alleged speech. *Not* introducing the voicemail is facially inconsistent with any inferred or imputed strategy as it posed no risk of incrimination in light of trial counsel's prior jury statements.

In the scant three minute cross-examination of Bruce, trial counsel developed an evidentiary predicate for the voicemail but then inexplicably abandoned its introduction. Doing so was analogous to a captain who pledged unique sightseeing at an exotic port-of-call but then sailed right past the harbor to the disillusionment and bewilderment of his passengers. Such antics take the color of "a useless charade" that "disserve the interest of his client" (*Cronic*, at 657

ff.19). These tactics devalue the evidence and suggest that a witness' account is fully reliable (*Davis*, at 318).

The probative value of the voicemail did not vanish merely because Bruce admitted to using profanity. This is even more true in that Bruce claimed Petitioner acted in a crazed frenzy because the voicemail reveals that Petitioner was remarkably calm even in the face of Bruce's hostility. So while the voicemail provides indisputable proof that Petitioner did not utter the speech alleged in the second count of the indictment, it would have further suggested that the events occurred neither in the manner nor for the purpose alleged in the first count. So while the voicemail was the sole manner of proving Petitioner's innocence of the second count, it was also the best manner of disproving the elements of the first count because every juror "would have found it necessary to establish some different motive, or, if the same motive, an intent far more speculative" (*House*, at 541).

Trial counsel's mishandling of the voicemail failed his duty "to marshal the evidence into a coherent whole" and confused the jury with "unassembled facts" (*Argersinger*, at 46). Worse still, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness" (*Davis*, at 318). A central premise of *Powell v. Alabama* is that the right to counsel exists so that counsel may "bring to bear such

skill and knowledge as will render the trial a reliable adversarial testing process" (*Strickland*, at 688). To the extent that trial counsel's actions demonstrate that such skill and knowledge were not brought to bear, nor that the evidence was coherently marshaled, the evidence was not reliably tested nor presented to the jury and trial counsel was thus actually ineffective.

### CRONIC 2: ABANDONMENT OF SECOND COUNT

Petitioner restates and extends the foregoing *Strickland* discussion as a concurrent *Cronic* error. Trial counsel's failure to introduce any evidence or elicit any testimony concerning the second count of the indictment constituted an abandonment thereof. Petitioner argues that abandonment of any factually-related count is as equally unconstitutional as abandonment of all counts. This is particularly true of terroristic threats (see *Murrell v. State*, 317 Ga. App. 310 (2012), at 316). If so construed, no showing of prejudice would be required (*Cronic*, at 659).

### STRICKLAND 4: DIRECTED VERDICT

Outside of the jury's presence, trial counsel moved for directed verdict as to the first count of the indictment based on *Milner v. State*, 297 Ga. App. 859 (2009). Testimony at Milner's trial did not objectively substantiate that Milner threatened "murder" and the appellate court held that "it [was] probable that the jury convicted Milner of threatening the victim with bodily harm" (*Milner*, at 860).

This in turn gave rise to a fatal variance. (*Milner*, at 861, citing *Hall v. Wheeling*, 282 Ga. 86).

Bruce testified that Petitioner's alleged threat was "street slang for 'shoot you'" which Bruce took to connote "bodily harm." So even if Bruce's account were accepted as true, the State failed to prove the character of murder and Petitioner was entitled to directed verdict as a matter of law. But rather than argue *Milner*'s fatal variance as a question of law, trial counsel argued *Milner* as a question of fact in that Bruce's testimony supported the different offense of assault. Arguing the factual question would have been logically correct if seeking lesser-included offenses in the jury charge, but it is not within *Milner*'s ambit for a directed verdict.

Apart from being inconsistent with *Milner*'s analysis, trial counsel's argument was also technically inappropriate since terroristic threats and assault are not necessarily exclusive under the instant factual predicate. This error was further compounded by counsel's confusion of the elements of aggravated and simple assault (O.C.G.A. §§ 16-5-20, 16-5-21). Were it not for his blunder, trial counsel could have sought instruction on simple assault as a lesser *misdemeanor* offense. Simple assault, in turn, also permits a special defense under O.C.G.A. § 16-5-25.[15]

---

[15] To wit: "A person charged with the offense of simple assault or simple battery may introduce in evidence any opprobrious or abusive language used by the person against whom force was threatened or used; and the trier of facts may, in its discretion, find that the words used were justification for simple assault or simple battery."

But since trial counsel had misstated the assault statutes, he could not then argue simple assault nor assert its special defense. The court denied the motion for directed verdict, but announced that it would issue a special instruction. Trial counsel, though, commenced no discussion as to the character or scope of such instruction and thereby failed to preserve a reviewable issue.

Trial counsel's sloppiness and negligence presents three errors and prejudices. First, misarticulating *Milner*'s holding failed the competency expected of a decade-seasoned attorney and such ineptitude deprived Petitioner of a sound ruling on a question of law. Second, misstating aggravated and simple assault deprived Petitioner of jury contemplation of a lesser included *misdemeanor* offense as well as the special defense which it would have carried. Third, failing to discuss jury instructions denied Petitioner of a properly instructed jury capable of returning a reliable verdict.

STRICKLAND 5: DENIAL OF CONFRONTATION

The Sixth Amendment is not *merely* the right to counsel. Timeliness, openness, jury, venue, notice, confrontation, and compulsory process are all precedent rights which, "contrived as protections for the accused, should not be turned into fetters." (*Adams v. United States ex rel. McCann*, 317 U.S. 269, 279). Moreover, these rights are "given directly to the accused; for it is he who suffers the consequences if the defense fails" (*Faretta v. California*, 422 U.S. 806, at 819-

820). This is not to say that a defendant who has elected the assistance of counsel should necessarily be heard apart from his counsel,[16] but the election of counsel cannot Constitutionally be permitted to spoil the defendant's other protections.

It has been a vogue paternalistic sentiment for many years now to accord near plenipotentiary authority to defense counsel, but this view risks refashioning the "guiding hand of counsel" as an obdurate fist of despotism. "Lawyers in criminal cases are necessities, not luxuries; [t]heir presence is essential because they are the means through which the other rights of the person on trial are secured." (*Cronic*, at 653; quoting *Argersinger* at 31-32, *Gideon* at 343-345, and *Powell* at 68-69; emphasis added; punctuation omitted). Since the one secures the others, the one must not operate to suppress or forfeit another. Obviously, an attorney cannot autonomously waive jury nor command his client's testimony.

Similarly, an attorney might decide it appropriate to pursue a change of venue, but he could not Constitutionally ignore his client's objection thereunto. In short, suppressing the defendant's voice and judgment when "he, though a layman is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms" (*Adams*, at 280). If true of venue and jury, it must also be true of confrontation.

---

[16] "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." (*Argersinger v. Hamlin*, 407 U.S. 25, at 31; see also *Gideon v. Wainwright*, 372 U.S. 335, at 345; *Powell v. Alabama*, 287 U.S. 45, at 69).

As *Faretta* poignantly noted, due process safeguards belong to the defendant and counsel ought not cavalierly treat them otherwise lest the necessity of the defendant's presence be nullified "for the opportunity must be his to advise with his counsel and cross-examine his accusers" (*Snyder v. Massachusetts*, 291 U.S. 97, at 114; internal citations omitted). Moreover, *Snyder* highlights the linkage of presence and participation: "defense may be made easier if the accused is permitted to be present […] for it will be in his power, if present, to give advice or suggestion" (*Snyder*, at 106). In such manner, a trial counsel who comports himself as augustly autonomous injures and disenfranchises his client.

This is not to say that a defendant is entitled to micromanage his counsel, nor that counsel must obey imprudent or reprehensible directives, but rather it is to reinforce that "guiding hand" and "assistance of counsel" were intended to connote partnership as well as presence. In fact, to the extent that confrontation cannot be satisfied if the defendant is absent, it is physically attached to the him and is his alone to waive.

After the anemic three minute cross-examination put to Bruce—which was followed by Varnum's excusal without cross-examination— Petitioner gave his trial counsel a specific written directive to cross-examine Bolan about Bolan's and Varnum's inability to have observed the events from Bolan's balcony. Though written hastily (and tersely) as the State was completing its direct examination of

Bolan, the tone of note reveals a great deal as to trial counsel's conduct, and Petitioner's insistence upon confrontation:



**PETITIONER'S NOTE TO COUNSEL[17]**

This note clearly shows Petitioner's frustration with trial counsel's unsound path; it shows Petitioner's objection to the peril to which he was being subjected by his counsel's refusal to develop the facts; and it shows Petitioner's clear invocation of confrontation. Just as with the hypothetical change of venue, trial counsel enjoyed a certain degree of implied authority to act in the interest of his client, but such implied authority was clearly limited and/or revoked by Petitioner's capable and sound wish. Nevertheless, trial counsel excused Bolan without questioning.

Melton next testified that in the intervening years she had become a nurse, which might explain her unembellished, factual candor. When Melton testified that Petitioner was a "professor" at Valdosta State University at the time of the

---

[17] After trial counsel discarded several prior handwritten observations during direct testimony, Petitioner conscientiously retained subsequent items which Petitioner is prepared to produce for the court's examination and satisfaction as to contemporaneousness with the proceedings.

incident, Petitioner—partly written, partly spoken—expressed to counsel that it was imperative to question her about Petitioner's university employment. The cat, as it were, was out of its bag and the jury would be forced to reconcile Bruce's, Varnum's, and Bolan's alleged mania with the cultural conceptualization of university professors as respectable, cerebral, and contemplative academics. The jury's presumptive inference would not tend to be an escalating verbal quarrel which reflected poorly on both interlocutors, but rather an intent or wantonness that demanded a stricter construal. To whatever degree that the jury resented Bruce's egocentrism, they now equally resented Petitioner. There was thus a renewed and urgent need to *re*-marshal the evidence (*Argersinger*, at 46) and/or to explore and expose Bruce's temperament (*Davis*, at 316). Trial counsel did neither.

After the State rested and the botched motion for directed verdict was heard, trial counsel summarily told the court that Petitioner would not testify. When the court inquired, Petitioner acknowledge that it was unlikely but also expressed resistance to trial counsel's presumptuous statement. When the proceedings resumed in the afternoon, trial counsel noticed the court that he and Petitioner had "conferred" and that Petitioner would not testify (however, no such conference or discussion had actually occurred).

Later in closing arguments, the State twice made reference to Petitioner's election not to testify. Trial counsel made no objection despite Petitioner's pleas

and trial counsel later refused to enter an untimely objection after the jury was excused. Petitioner thereupon passed this note to trial counsel:



**ANOTHER NOTE TO TRIAL COUNSEL**

Trial counsel insisted on knowing why Petitioner wished to be heard, and refused to notice the court unless and until Petitioner explained. Reluctantly, Petitioner expressed that he wished the record to reflect—prior to verdict—that Petitioner denounced counsel's opening statements and abandonment of confrontation, and the reasons why Petitioner considered the representation to be ineffective. Trial counsel refused to notice the court, to request sidebar, or to request jury excusal. In this way, Petitioner never had the opportunity to raise these issues.[18]

---

[18] In preparing this brief Petitioner now notes that it would have been perfectly proper for the court to at least *hear* Petitioner on those issues given that "[t]he constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court" (*Johnson v. Zerbst*, 304 U.S. 458 (1938), at 465) where such right is further recognized as "effective assistance of competent counsel" (*McMann*, at 771).

With respect to client participation, the U.S. District Court should take note of the *Georgia Rules of Professional Conduct*. In relevant part they provide that a "lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation" but "shall abide by a client's decisions concerning the scope and objectives of representation" (Rule 1.2a). A lawyer must "reasonably consult with the client" as would be proper for the client "to participate intelligently in decisions [...] to the extent the client is willing and able to do so" (Rule 1.4a; Rule 1.4 n.5; respectively). As corollary to *Strickland*, Petitioner avers that only an incompetent attorney would act contrary to the rules of professional conduct for such rules are the measure of competent legal services.

As a seasoned public defender, trial counsel knew this to be true, just as he knew the requirements of professional conduct. It is not only counterintuitive but also self-harming for counsel to refuse to notice the court of Petitioner's wish to be heard as such inquiry by the court would have actually afforded counsel a rare opportunity to explain himself in timely preemption of *ex post facto* construal by a habeas court. Petitioner speculates that trial counsel possibly acted under the duress of a third party as it would best explain why counsel acted in a way that served neither his nor Petitioner's interests.

CRONIC 3: POSSIBLE CONFLICT OR DURESS

> This enumeration is remote and tenuous, but given for purpose of
> preservation should future factual discovery warrant exploration

Petitioner is not burdened with explaining or theorizing the genesis of trial counsel's failures, though on balance the token representation might well suggest conflicted interest. Petitioner cannot be expected to ferret the extent of counsel's professional conflicts, though as a private conflict, there are facts that could give rise to a personal umbrage that trial counsel was humanly unable to adequately compartmentalize.

In 2014 Petitioner was a *pro se* party in a landlord-tenant/contract action in State Court. In the course of that proceeding, Petitioner discovered a conflict of interest with the presiding judge who subsequently recused. The facts giving rise to the conflict suggested that the presiding judge accepted unlawful campaign contributions from a local attorney who was served as his campaign chairman. This attorney was a senior partner at a very prominent law firm which represented the opposing party. But of greater public concern, this firm appeared to litigate a disproportionate number of cases before that judge. Petitioner therefore forwarded the evidence (some fifty pages of campaign finance reports, corporate filings, spreadsheets, and internet searches) to state regulators.[19]

---

[19] Petitioner, in explanation of his intent, would refer to the conclusion of his sworn complaint submitted to the state Campaign Finance Commission: "*any corruption, no matter how great or trivial, stands to impact thousands of citizens who depend on the impartiality and integrity of the courts to ensure just civil restitutions and fair criminal proceedings.*"

As this issue arose from a civil action in State Court, there would be no reason to presume a conflict with a criminal trial in Superior Court. However, Petitioner has since learned that his trial counsel and said judge's brother are active members of the local punk rock band, Loomis Orange, and that said judge's father was trial counsel's employer from 2005 until 2015. While this set of circumstances does not necessarily give rise to a prescriptive professional conflict, it very well could give rise to personal conflict capable of eroding a zealous advocacy. Though the nature of the practice of law develops a professional mechanism for compartmentalization, even the best jurist is still human and subject to human foibles and insufficient self-awareness. Neither *U.S. v. Cronic* nor *Cuyler v. Sullivan* speak on point to this issue, but Petitioner believes that an evidentiary hearing should sufficiently resolve the matter.

Petitioner has suspicions that trial counsel may have been under duress to provide  Petitioner with a defective defense. However, the very articulation of such suspicions is scandalous, provocative, and Petitioner has reasonable concerns of retaliation. Therefore, Petitioner requests to reserve discussion for oral argument where the District Court would be better empowered to manage the discourse which enters the public record.

## GROUND III: FIFTH AMENDMENT

The State, in its arguments to the jury, referenced Petitioner's election not to testify at trial. The precision of wording required to argue this ground cannot be achieved until such time as the trial transcript is produced. Petitioner will seek the court's leave to supplement his brief on this ground once the record becomes available.

## CONCLUSION

Some four decades ago, Chief Justice Burger wrote that "any deprivation of liberty is a serious matter" (*Argersinger v. Hamlin*, 407 U.S. 25, at 41). Petitioner submits that such analysis is the cornerstone of *habeas corpus* and its miscarriage of justice doctrine. Accordingly, the Supreme Court has recognized actual innocence as a miscarriage exception weighty enough to overcome procedural barriers and defaults. Many *specific* exceptions have been ratified, but each of those had a first impression in its season and nascent exceptions have not been foreclosed. In 2006 the Supreme Court held in *House v. Bell* that the actual innocence exception survived AEDPA's passage. In 2013, the High Court held in *McQuiggen v. Perkins* that actual innocence withstood AEDPA's statute of limitations. It is only logical that an actual innocence exception to an untimely (late) petition would just as properly apply to an untimely (early) petition because, as noted in *House*, comity must yield to correcting a fundamental injustice.

The actual innocence exception is but a gateway to present a constitutional claim which Petitioner states in chief as ineffective assistance of counsel. Petitioner alleges that his appointed counsel's performance was so manifestly wanting in adversarial character that it was a constructive denial of counsel. Petitioner's trial counsel introduced no evidence, called no witnesses, raised a mere two objections, allocated a scant three minutes to cross-examination of the State's first witness about tangential minutia, confused the jury with aborted evidence, and then waived cross-examination of the State's remaining three witnesses. These failures fall below an objective standard expected of all attorneys and gave rise to concurrent *Cronic* and *Strickland* errors. Other *Strickland* errors arose in trial counsel's jury statements and his botched motion for directed verdict.

Counsel has a core duty to "zealously assert[] the client's position under the rules of the adversary system." (*Georgia Rules of Professional Conduct*, "Preamble," article 2). Under this umbrella, regardless of an attorney's primary strategy, there is no justification for not assiduously pursuing all other avenues which do not conflict with the primary strategy. This includes adequate preparation to ensure that secondary strategies are in place, ensuring that issues are duly preserved in the record, and respecting the defendant's collateral Constitutional protections.

Petitioner is not burdened with explaining or theorizing the cause of trial counsel's ineffectiveness, though on balance it would seem objectively apparent that Petitioner's counsel offered nothing more than a token appearance and intentionally frustrated preservation of errors. To the extent that counsel did not advocate Petitioner's case in any meaningful manner, it might be reasonably conjectured that trial counsel manifested some form of conflict of interest.

## PRAYER

For the foregoing reasons, Petitioner has and does pray the U.S. District Court hold an evidentiary hearing on the issues, order Petitioner's immediate release from custody pending such hearing, vacate the conviction of state court, and accord such further, different, or other relief as would be just and proper. Petitioner insists upon certificate of appealability should the court reject his actual innocence exception.

RESPECTFULLY SUBMITTED,


s/ John M. Woodruff
JOHN M. WOODRUFF, PH.D.

POST OFFICE BOX 4584
VALDOSTA, GEORGIA 31604
JOHN@JOHNWOODRUFF.COM
(404) 477-4652