IN THE SUPERIOR COURT OF LOWNDES COUNTY

STATE OF GEORGIA

STATE OF GEORGIA                    CRIMINAL ACTION,

      VS.                          FILE NO. 2012-CR-717

JOHN MICHAEL WOODRUFF,             CHARGES:
                                   Count 1: Terroristic Threats
        Defendant.              Count 2: Disorderly Conduct

TRANSCRIPT OF PROCEEDINGS

The following transpired before the Honorable RICHARD M. COWART, Judge, Superior Courts, and a Jury, in Courtroom 5-B of the Lowndes County Judicial Complex in Valdosta, Lowndes County, Georgia, on Monday, July 20th and Tuesday, July 21st, 2015.

APPEARANCES:

      FOR THE STATE:          MS. LAURA ANDERSON WOOD
                                Assistant District Attorney
                                Post Office Box 99
                                Valdosta, Georgia 31603

      FOR THE DEFENDANT:      MR. WADE N. KRUEGER
                                Public Defender
                                Post Office Box 1586
                                Valdosta, Georgia 31603

INDEX TO STATE'S WITNESSES

WITNESS                                                    PAGE NO.

MARTY BRUCE
        Direct Examination by Ms. Wood. . . . . . . . . .   13
        Cross Examination by Mr. Krueger . . . . . . . . .  26


MICHAEL VARNUM
        Direct Examination by Ms. Wood. . . . . . . . . .   30


SEAN BOLAN
        Direct Examination by Ms. Wood. . . . . . . . . .   36


BRADLINE MELTON
        Direct Examination by Ms. Wood. . . . . . . . . .   40



MOTION FOR DIRECTED VERDICT BY DEFENSE . . . . . . . . . .  48

CHARGE OF THE COURT . . . . . . . . . . . . . . . . . . .   56

VERDICT OF THE JURY . . . . . . . . . . . . . . . . . . .   69

INDEX TO EXHIBITS

| Exhibit No. and Description | Identified | Tendered | Admitted |
|---|---|---|---|
| S-1   Photograph | 17 | 17 | 17 |

1               P R O C E E D I N G S

2

3  [Monday, July 20, 2015, at 10:30 a.m. in open court.]

4

5          THE COURT: The Court calls case number 2012-CR-717,

6      State of Georgia versus John Michael Woodruff.   What

7      announcement for the State?

8          MS. WOOD: The State is ready, Your Honor.

9          THE COURT: For the Defense?

10         MR. KRUEGER: Ready, Your Honor.

11         THE COURT: Has the issue been joined in the case?

12         MS. WOOD: It has, Your Honor. A waiver was filed,

13     Your Honor.

14         THE COURT: Okay. Thank you.

15         Ladies and gentlemen, at this time, I'm going to ask

16     the Clerk to call the list of the first 14 jurors.   When

17     your name is called, please be seated in the jury box over

18     here beginning on the front row at the seat closest to the

19     audience.

20  NOTE:     (A jury of twelve persons and two alternates was

21            selected, chosen, and sworn in the captioned case.)

22         THE COURT: Ladies and gentlemen, the trial of this

23     case will begin at 9:30 in the morning in this courtroom.

24     I am going to ask you to report to your jury room.   The

25     Bailiff will show you where your jury room is before you

1    leave here today.  Let me caution you before you go that

2    you are not to discuss this case among yourselves, you're

3    not to discuss it with anyone else, you're not to allow

4    anyone to discuss it with you.  If anybody attempts to

5    talk to you about the case, you let me know about that,

6    we'll take the appropriate steps to deal with it.

7         Please don't read anything in the paper that may

8    relate to this case.  Don't listen to any news reports,

9    whether they be on radio or television.  I don't know that

10   there will be, sometimes there are, sometimes there not.

11   But your job is to decide this case based upon the

12   evidence that you hear in this courtroom and not based on

13   something you may have seen or heard outside the

14   courtroom.

15        Any other words of caution before I let the jury go?

16        MS. WOOD: No, sir.

17        MR. KRUEGER: Nothing further.

18        THE COURT: You are excused until 9:30 in the morning.

19   Before you go, I anticipate this case will probably be

20   completed tomorrow.  If not, we'll finish Wednesday

21   morning.  All right.  If you'll go out through this door.

22   NOTE:    (The jury was excused for the day at 11:40 a.m.)

23

24

25

5

1    PROCEEDINGS RESUMED AT 9:43 A.M. ON TUESDAY, JULY 21, 2015,

2    OUTSIDE THE PRESENCE OF THE JURY AS FOLLOWS:

3

4            THE COURT: Ms. Wood, Mr. Krueger, are we ready to go?

5            MS. WOOD: Yes, sir.

6            MR. KRUEGER: Your Honor, before we begin, Mr.

7    Woodruff is requesting permission to use his laptop

8    computer during the trial. He said that he has trouble

9    with his memory and relies on electronic devices to help

10   him keep information straight.  I know it's against the

11   courthouse rules and policies, but Mr. Woodruff is asking

12   for permission to use his laptop.

13           THE COURT: I don't mind him plugging it in.  I don't

14   want him hooking it into the evidence presentation system,

15   but just using a plug -- is that what you're --

16           MR. KRUEGER: Right.  It's not hooked into the

17   evidence --

18           THE COURT: Is it on a battery or a plug?

19           DEFENDANT WOODRUFF: It's presently plugged into a

20   floor outlet.

21           THE COURT: Well, that will be all right.

22           MR. KRUEGER: Thank you.

23           THE COURT: Anything else we need to take up before we

24   bring the jury in?

25           MS. WOOD: No, sir.

1              MR. KRUEGER: Nothing, Your Honor.

2              THE COURT: You may bring them in.

3    NOTE:      (Jury in at 9:46 a.m.)

4              THE COURT: Good morning, ladies and gentlemen.

5         Before we begin, I'm going to ask the Clerk to administer

6         the trial oath to each one of you.

7              CLERK OF COURT: Please raise your right hand.  You

8         shall well and truly try the issue formed upon this

9         indictment between the State of Georgia and John Michael

10        Woodruff, who is charged with the offenses of Terroristic

11        Threats and Disorderly Conduct, and a true verdict give

12        according to the evidence, so help you God.

13             THE COURT: Thank you.  We're now prepared to begin

14        the trial of the case.  Before we do, I want to just take

15        a couple of minutes to acquaint you with the procedure

16        we're going to follow.  I think it's helpful for jurors to

17        understand what we're doing and why we're doing what we're

18        doing.  It's been my experience when we select a jury that

19        there's probably a couple, three or four people maybe,

20        that have served on a jury before and the majority of the

21        jurors have not.  And, so, therefore, what a lot of people

22        know about the courts and trials is what they've seen on

23        television, and, unfortunately, most of that is not very

24        accurate.  So, I think it's helpful for you to know the

25        procedure we're going to follow and why we do what we do.

1          In just a moment, I'm going to call on the attorneys

2     to make opening statements.  You've already met Ms. Wood

3     with the District Attorney's Office, who is prosecuting

4     the case, and Mr. Krueger, who is the Defense lawyer in

5     this case.  What the lawyers will say to you in their

6     opening statements is not the evidence.  You're going to

7     hear the evidence during the course of the trial.  But,

8     it's an attempt by each side to outline the case for you

9     and to tell you what they expect the evidence in the case

10    is going to show.

11         Once the opening statements are completed, then the

12    State will present its case first.  Now, as you already

13    know, this is a criminal case.  In a criminal case, the

14    State has the burden of proving the elements of the crimes

15    charged and the guilt of the Defendant to your

16    satisfaction and beyond a reasonable doubt.  Every

17    Defendant comes into a court of law with a presumption of

18    innocence in their favor.  That presumption stays with

19    them and protects them throughout the trial unless and

20    until it is overcome with evidence produced by the State

21    which is sufficient to convince you of the guilt of the

22    Defendant beyond a reasonable doubt.  There is no burden

23    of proof on the defense.  The Defendant does not have to

24    prove his innocence.  The State has the burden of proof in

25    a criminal case.  Therefore, the State will present its

1    case first.

2        Once the State has presented its case, then the

3    Defendant will be given an opportunity to put up any

4    evidence that he thinks will be helpful to you in deciding

5    this case.  Now, having said that, let me say, again, that

6    the Defendant does not have to prove anything.  A lot of

7    times, defendants will not put up evidence, sometimes they

8    do, sometimes they don't.  It depends on the fact

9    situation in the particular case.  Sometimes defendants

10   testify, sometimes they don't.  That's a decision that

11   they make with their attorney.  If the Defendant does not

12   testify in this case, if they don't put up any evidence,

13   you're not to draw any negative inference from that.  And

14   the reason for that, of course, is the Defense does not

15   have any burden of proof.  The State has to prove the

16   case.

17       Once all of the evidence has been presented, then the

18   attorneys will make closing arguments.  At that point, I

19   will instruct you on the law that's applicable to this

20   particular case.  It's important that you keep an open

21   mind throughout the trial, that you not make up your mind

22   as to any of the issues involved in the case until you've

23   heard all of the evidence, the attorneys' closing

24   arguments, and then I instruct you on the law.  At that

25   point, I will tell you to go out and begin your

1    deliberations.  You're not to begin deliberating this case

2    at any point until the case is over and you're actually

3    told to go out and begin your deliberations.

4        We'll be taking breaks -- I anticipate we'll finish

5    this case today.  We'll take a break for lunch.  We'll be

6    taking a break about every hour and 15 minutes, hour and a

7    half, something like that.  When we take these breaks, you

8    can talk to each other about anything you want to talk

9    about, just don't talk about the case.  Wait until it's

10   over, until you've heard the Charge of the Court, and, at

11   that point only, will you begin your deliberations.

12       Once you begin your deliberations, you should only

13   discuss the case in the presence of all the other jurors.

14   If anybody has to leave the room for whatever reason, you

15   should stop talking about the case, wait until they come

16   back, and then resume your deliberations at that point.

17   If you need anything during the course of this trial,

18   don't hesitate to let me know or one of the bailiffs know

19   or one of the deputies know.  It's not our intention for

20   anybody to be uncomfortable.  If you need to make a phone

21   call, you let us know that, and we'll take care of that.

22   If you need to take a break before I get ready to take a

23   break, just let me know.  Raise your hand or get one of

24   the bailiff's attention and we'll take a break.  That's

25   fine with me.  It's my job to make sure this case proceeds

1     as smoothly and efficiently as possible according to the

2     law.  It's your job to be able to sit there and listen to

3     the evidence and pay attention to what's going on, and, if

4     you've got your mind on something else, you're not paying

5     attention.  So, just let me know, and we'll take a break.

6     That will be fine.

7          Ms. Dart and Mr. Ponder, as I think both of you know,

8     you are both alternate jurors.  You're just as much a part

9     of this jury as everybody else.  The only difference is,

10    assuming that all twelve jurors are able to complete the

11    trial, and hopefully we can in a short case, but at the

12    point of deliberations, y'all will not actually deliberate

13    the case.  We'll find you somewhere else to sit that

14    you'll be comfortable while the jury is deliberating.  I

15    just like to tell alternate jurors that because I've had

16    problems in the past when I forgot to do it and they get

17    ready to deliberate and the alternates are mad at me

18    because I won't let them deliberate.  But, having said

19    that, it's not unusual when we try a case -- we pick

20    alternates because sometimes people get sick, sometimes

21    people have a family emergency that's unexpected.  I mean,

22    things happen.  And, if that were to happen, then you

23    would become part of the jury.

24         Ms. Dart, you're the first alternate, so if we lost

25    one of our twelve jurors, you would step in in their

1    place.  And then, Mr. Ponder, if we lost two, then you

2    would step in in that place.  So, it's highly possible

3    that you could be deliberating the case, too.  So, it's

4    just as important that you participate and pay attention

5    as everybody else.

6         I'm going to let the Bailiff pass out some pads and

7    pencils.  Sometimes jurors need them, sometimes they don't

8    want them.  These are strictly for your use for you to

9    take notes if you want to take notes.  If you don't want

10   to take notes, that's fine too.  Nobody is going to look

11   at what you write down.  We don't keep those.  We tear

12   them up when the case is over.  They do not become part of

13   the record in the case.  They are strictly for your use.

14   So, use them if you want to.  If you don't want to take

15   notes, you don't have to.  I would suggest that you write

16   your name, not on the cover, but on the first page.  That

17   way, the Bailiff can kind of keep up with them during

18   lunch and all.

19   NOTE:    (Pads and pencils are distributed to the jury.)

20        THE COURT: All right.  Ms. Wood, does the State want

21   to make an opening statement?

22        MS. WOOD: Yes, sir.  Thank you.

23   NOTE:    (Opening statements were made by Ms. Wood for the

24        State, followed by Mr. Krueger for the Defense

25        without any objection being made by either side.)

1          THE COURT: The State can call their first witness.

2          MS. WOOD: We call Marty Bruce.

3                              **MARTY BRUCE**,

4    HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

5    FOLLOWS:

6                          DIRECT EXAMINATION

7    BY MS. WOOD:

8          Q     Tell us your name, please, sir, and by whom you're

9    employed.

10         A     Marty Bruce.  I'm currently employed with the Hendry

11   County Sheriff's Office.

12         Q     And where is that?

13         A     In South Florida.

14         Q     And where were you employed on June the 6th of 2012?

15         A     I was employed as a Deputy Sheriff with the Lowndes

16   County Sheriff's Office.

17         Q     And how long have you been in law enforcement?

18         A     A little over 13 years.

19         Q     And were you, in fact, working on June the 6th of

20   2012?

21         A     No, I was off duty.

22         Q     And this incident that we're here for, where did that

23   occur?

24         A     It occurred at 611 Pineview Drive.  At the time, I

25   was -- my girlfriend of about ten or 12 months, she lived at

1    that location, and I was coming to her apartment to drop off

2    some food for her.

3        Q    And had she lived at that apartment the entire time

4    y'all had been dating?

5        A    Yes.

6        Q    And had you visited her at her apartment?

7        A    Yes, on numerous occasions.

8        Q    And were there occasions where you spent the night at

9    that apartment?

10        A    Yes.

11        Q    When you were employed as a Sheriff's Deputy, what

12    kind of clothing would you wear?

13        A    Fully marked uniform signifying myself as a Deputy

14    Sheriff.  It's basically a tactical uniform because I was on a

15    specialized unit for the Sheriff's Office.

16        Q    It clearly had a badge of office marked?

17        A    Yes, ma'am.

18        Q    Gun belt?

19        A    Yes.

20        Q    And what kind of vehicle did you drive for your job?

21        A    I had a fully marked Chevy Tahoe.  I was a K-9

22    handler, so it signified a K-9 in the vehicle, patrol lights on

23    top, fully marked.

24        Q    Okay.  And, at that time, did you also have a vehicle

25    that you drove when you were off duty?

1    A    Yes.

2    Q    And what was that?

3    A    It was a black Chevrolet Duramax diesel pickup truck.

4    Q    Kind of a big truck?

5    A    Yeah, it was four-wheel drive, yeah.

6    Q    Okay.  Now, on June 6th of 2012, you said that you

7    went to -- what was the name of the apartments?

8    A    Tremont, I believe is the name of it.

9    Q    And those apartments are here in Lowndes County,

10   correct?

11   A    That's correct.

12   Q    And when you got to the apartment complex, what did

13   you do?

14   A    I called my girlfriend, and I told her to let me in

15   the gate.  I had just given -- I had always had a key card to

16   get into the establishment, and I had given my key card to one

17   of her friends, so she could watch her dogs while we were out

18   of town.  So I called her -- and her apartment building is only

19   two buildings from the location where you have to scan the key

20   card for the entrance.  I called her, and she stepped outside

21   and began pressing the button to activate the gate to open it.

22   Q    Is it a remote?

23   A    It is a remote, yeah.

24   Q    And did the gate open when she was on the porch?

25   A    No, not while she was on the porch.

1      Q     And what happened while you were waiting for her to
2   open the gate?
3      A     The Defendant pulled in behind me, I mean, very close
4   to my vehicle and began just laying on the horn, continuously
5   blowing the horn, which caused me to look up to see what was
6   going on.
7      Q     Did he say anything to you at that point?
8      A     He began -- he rolled down his window, and he told me
9   in his words to, "Get the fuck out of the way you stupid mother
10  fucker."
11     Q     Is that the first thing he said to you?
12     A     Yeah, yeah. Yes, he rolled down his window and that's
13  initially what he said to me.  He was shouting that at me.
14     Q     And did you -- first of all, did you respond to him
15  with profanity?
16     A     Yeah, I asked him -- I don't remember verbatim what I
17  said, but, yeah, I did ask him what his problem was, yeah.
18     Q     And what did he say then? Do you remember?
19     A     I remember that he pulled up beside my vehicle, and
20  he still had his window down.  And I asked him -- I said, "You
21  know who I am."  And he said he didn't give a fuck who I was.
22  And I told him that I was waiting on my girlfriend to open the
23  gate.  He continued to curse, and he told me he didn't give a
24  fuck who I was waiting on.  Then he told me he didn't care who
25  I was or what I did.

1      Q    And when you -- so what did you do after -- first of
2    all, I'm going to show you what's been marked as State's
3    Exhibit Number 1.  Do you recognize that?
4      A    Yes, ma'am.
5      Q    Can you tell us what that is?
6      A    It's the entrance of the --
7      Q    Is it a photograph?
8      A    Yes.  It's a photograph of the entrance of the
9    apartment complex.
10          MS. WOOD: Your Honor, at this time, we would tender
11          in State's Exhibit Number 1.
12          THE COURT: Any objection?
13          MR. KRUEGER: No objection, Your Honor.
14          THE COURT: State's Number 1 will be admitted without
15          objection.
16          MS. WOOD: And, Your Honor, if I may publish it to the
17          jury.
18   NOTE:    (State's Exhibit Number 1 is published to the jury.)
19   BY MS. WOOD:
20     Q    And what is this right here that I am pointing to?
21     A    That's the entrance to the apartment complex.
22     Q    And what is this back here?
23     A    That's -- up forward just a little more is the box to
24   which you use the key card.
25          THE COURT: Wait a minute, Laura.  Are they all on?

1  NOTE:        (Affirmative responses from the jurors.)

2              THE COURT: Okay.  You can go ahead.

3  BY MS. WOOD:

4      Q    All right.  We're going to go back just a minute.

5  What is this right here?

6      A    That's the box that activates the key card to enter

7  the apartment complex.

8      Q    All right.  And, so, this is the area that you're

9  talking about, correct?

10     A    Correct.

11     Q    And when you said he pulled up next to your vehicle,

12 what side of your vehicle did he pull up to?

13     A    He was on the passenger side.

14     Q    All right.  If you could, indicate on that screen --

15 and, again, just by a dot -- where was your car?

16     A    (Indicates.)

17     Q    Okay.  Your car was right there?

18     A    In this area, yes.

19     Q    And where did he come up?

20     A    He came up to -- he came up to here on the right side

21 of my vehicle.

22     Q    All right.  And what did you do -- let me ask you

23 this, were you effectively blocking his way into the apartment

24 complex at that point?

25     A    Initially I was.  And I could see his demeanor.  He

1    was extremely agitated.  I'd never seen him act like that

2    before, so, in an attempt to diffuse the situation, I backed my

3    truck up and then he came and blocked me from gaining access.

4    At this point, my girlfriend was already out walking into the

5    parking lot continuously hitting the clicker to activate the

6    gate to be opened.

7         Q    Okay.  Where did -- in relationship to this picture,

8    where did your girlfriend live at that time.

9         A    She lived in this building right here. And she lived

10   -- if you're facing the apartment, it's the apartment upstairs

11   and to the right.

12        Q    And, so, that would be this apartment right here?

13        A    Correct.

14        Q    Okay.  And when you -- so you moved your car

15   backwards and let him pass?

16        A    Uh-huh (affirmative response).

17        Q    Is that what you said?

18        A    Yes, ma'am.

19        Q    And he went through the gate, correct?

20        A    Yes.  He came through the gate and that's when he

21   told me that, "If you come on this property, I'll put a cap in

22   your ass."

23        Q    And let me ask you about that.  Have you ever heard

24   that phrase before, "put a cap in your ass"?

25        A    On numerous occasions, yes.

1     Q    And you're familiar with that phrase, familiar with

2  that term?

3     A    Yes.

4     Q    Okay.  What does that mean?

5     A    It's street slang for shoot you.

6     Q    And did you take that as a threat --

7     A    Yes.

8     Q    -- of bodily harm or to kill you?

9     A    Yes.

10     Q    All right.  Now, where was the Defendant when he said

11  that to you?

12     A    He had pulled right in front of my car at the

13  entrance where the gate opens and closes.

14     Q    And was he blocking your entrance to the property at

15  that point?

16     A    Yes, ma'am.

17     Q    And did -- at this point, did anyone else become

18  involved in the situation?

19     A    Well, by that time, my girlfriend had made it -- I

20  don't know exactly the distance, but close to the gate where

21  her key card was activating the gate to allow me in.  And she

22  could hear him shouting, and she was telling him that --

23     Q    Okay.  We'll let her testify about that.  But she was

24  on scene and you saw her trying --

25     A    Correct.

1      Q     -- to open the gate and let you in?

2      A     Correct.

3      Q     And, at that point, did he allow you to have access

4  to the property?

5      A     No.  It was after she got into a -- the two were

6  engaged in a shouting match, then he -- I told her that I was

7  -- I saw that the situation was escalating, so I told her and

8  him that I was going to contact the Sheriff's Office.

9      Q     All right.  And, during this period of time, did you

10  ever get out of your truck?

11      A     No.

12      Q     Did he get out of his car?

13      A     Not that I can recall.

14      Q     Now, had you ever seen Mr. Woodruff before?

15      A     Yes, on numerous occasions.  His apartment was -- and

16  I'll circle it -- to the left facing the apartment.  His

17  apartment was right here.  It was directly to the left of her

18  apartment.

19      Q     So, he was her neighbor?

20      A     Yes.

21      Q     Had you ever spoken to Mr. Woodruff prior to this

22  occasion?

23      A     Yes.

24      Q     Where was it?  How would it happen that you would

25  speak to him?

1      A      Just coming and going, me leaving her apartment.  He
2    would engage in conversation or I would engage in conversation
3    with him.  We just had casual conversations, brief casual
4    conversations.
5      Q      What type of conversation -- what would be the
6    subject of that conversation?
7      A      I recall him asking me questions about, like, gun
8    laws and stuff in Georgia because he had told me he was from
9    Alabama, and he informed me --
10            MR. KRUEGER: Your Honor, I object.  This line of
11            testimony has no relevance to the charges in the
12            indictment.
13            THE COURT: Ms. Wood?
14            MS. WOOD: Your Honor, I would argue that it, in fact,
15            does because it goes to the issue -- circumstances of
16            terrorizing Deputy Bruce and the reason he was afraid of
17            the statement that was made.
18            MR. KRUEGER: Your Honor, whether Mr. Bruce was afraid
19            of the statement is not an element of the charge.
20            THE COURT: Well, I think previous conversations
21            between the parties as to whether they knew each other or
22            not would be relevant, so I'll overrule the objection.
23    BY MS. WOOD:
24      Q      Now, when you would have these conversations -- the
25    passing conversations with Mr. Woodruff prior to this incident,

1    did you -- were you ever wearing your uniform?

2        A    Yes.

3        Q    Were you ever in street clothes?

4        A    Yes.

5        Q    On the property, had you taken both your personal and

6    your work vehicle, alternating at different times?

7        A    Yes.

8        Q    Now, were you ever actually living at that residence?

9        A    No.

10       Q    How did you contact the Sheriff's Department?

11       A    I contacted dispatch and --

12       Q    Which is --

13       A    Our communication center, 911.  I contacted them and

14   asked them for the supervisor -- I asked which supervisor was

15   on duty at that period of time.

16       Q    And then you called that --

17       A    I called that lieutenant.  They informed me that it

18   was Lieutenant Terrell, so I contacted him and told him what

19   was going on and asked if he would send a deputy.  And because

20   it was an incident involving me being off duty, I asked that he

21   respond as well.

22       Q    And did he respond?

23       A    He did.

24       Q    And did another officer respond as well?

25       A    Yes, ma'am.

1   Q  And was that Deputy Altman?

2   A  That's correct.

3   Q  Did you have any further contact -- well, let me ask

4 you this, how did the situation with Mr. Woodruff parked right

5 there blocking your entrance, how did that resolve?  I mean,

6 did he leave?

7   A  Yes, he did.

8   Q  When did he leave?

9   A  After I informed him that I was contacting the

10 Sheriff's Office, he sped off and went into his -- parked in

11 front of his apartment and went inside his apartment.

12   Q  All right.  Did you -- and you said that you never

13 once got out of your car?

14   A  No.

15   Q  Okay.  And why didn't you get out of your car?

16   A  Being in fear that he would have a weapon in his car.

17 In prior conversations, he had told me that he always carries

18 guns, so I wasn't going to get out of my vehicle and approach

19 him with fear of him having a weapon in the car.

20   Q  After this situation, did you have anymore contact --

21 did you have any further contact with Mr. Woodruff?

22   A  No, ma'am, not that I can recall.  No, I didn't.

23   Q  Now, was any part of this recorded in any way?

24   A  There is an audio recording of when I was calling her

25 to ask her to come down while she was standing in the breeze

1    way of her apartment.  That is recorded.

2         Q    How did that happen?

3         A    It was on her voicemail.  When I saw him -- when he

4    started shouting at me, I didn't hang the phone up.  I left the

5    phone sitting on my center console, so it recorded some of our

6    conversation.

7         Q    And, in that conversation, can you be heard clearly?

8         A    Yeah.

9         Q    Can Mr. Woodruff be heard as clearly?

10        A    Maybe not as clearly because he was a further

11   distance than myself, being the phone was on the center console

12   and he was on the other side of the vehicle.

13        Q    And have you listened to that recently?

14        A    Yes.

15        Q    And, in that call, did you use profanity?

16        A    Yes.

17        Q    All right.  And I'm going to ask you to do this, if

18   you would.  If you will, just demonstrate where his car was

19   when he blocked your access.

20        A    It was right in this area here.

21        Q    So he pulled up --

22        A    Pulled up, yeah, not allowing me to come through the

23   gate.  That's where the gate is there where the black is.

24             MS. WOOD: If I may have just one second, Judge.  Your

25             Honor, I believe that's all I have of this witness.

1          THE COURT: Mr. Krueger?

2          MR. KRUEGER: Thank you, Your Honor.

3                    CROSS EXAMINATION

4    BY MR. KRUEGER:

5          Q    Good morning.

6          A    How are you, sir?

7          Q    Doing well.  I don't believe we've met.  I'm Wade

8    Krueger of the Public Defender's Office.

9          A    Nice to meet you, sir.

10         Q    Nice to meet you.

11              What is your current title down in Hendry County?

12         A    I'm sorry?

13         Q    What is your current title, job title?

14         A    I work in Special Operations as a K-9 handler on a

15   Criminal Interdiction Unit.

16         Q    Just standing here talking to you, should I call you

17   Officer or Deputy or --

18         A    Deputy.

19         Q    Deputy, thank you.  Okay.  So, Deputy Bruce, we're

20   talking about this incident on June 6th, 2012.  You testified

21   on direct examination that you are familiar with this voicemail

22   recording.

23         A    I'm sorry, sir?  I can't hear you.

24         Q    You testified on direct examination that you are

25   familiar with this voicemail recording that Ms. Wood has

1    referred to?

2          A    Correct.

3          Q    And you have listened to that recently?

4          A    I have.

5          Q    Okay.  Within the last 24 hours?

6          A    Yesterday evening.

7          Q    Okay.  So your recollection of it is pretty fresh?

8          A    Yes, sir.

9          Q    Okay.  And, so, do you recall hearing at the

10   beginning of the recording -- I understand the recording

11   doesn't capture the entire incident?

12         A    Correct.

13         Q    Or the entire conversation.  But do you recall that

14   among the first things you hear on the recording is your voice

15   saying to Mr. Woodruff, "What's your fucking problem, man?"

16         A    Yes.  That was after he had ran up or driven up

17   inches from my vehicle and began laying on the horn.  Yeah, I

18   did say that.

19         Q    And do you recall hearing on the recording it sounded

20   like at one point Mr. Woodruff is trying to tell you to push

21   the call box button?

22         A    No.

23         Q    Do you recall calling Mr. Woodruff a dip shit on the

24   recording?

25         A    Yeah.

1      Q     And do you recall in the recording when Mr. Woodruff
2    says, "I'll bust a cap in your ass"?
3      A     Do I remember him saying that on the recording?
4      Q     At any point on the recording.
5      A     Yes.
6      Q     And when he said this, he did not go on to say, I'll
7    put a bullet in your heart?
8      A     He didn't, but --
9      Q     Yes or no? I'll put a bullet in your heart?
10     A     May I explain?
11     Q     I'm asking you a yes or not question.  Did he say,
12   I'll put a bullet in your heart?
13     A     He didn't, but --
14     Q     Okay.
15     A     -- I'll have to explain further.
16     Q     Well, Ms. Wood can handle that on redirect if she
17   feels that she needs to.
18           MS. WOOD: Judge, I think he's allowed to explain his
19        answer.
20           THE COURT: All right.  Well, answer his question and
21        then you can explain.
22           MR. KRUEGER: He's answered the question, no, he did
23        not say, I'll put a bullet in your heart.
24           THE COURT: You can explain your answer.
25     A     (By the witness) From working in law enforcement for

1    13 years, I know that the meaning of, "I'll put a cap in your

2    ass," means I will shoot you.

3        Q    Okay.  He didn't say, though, I'll put a bullet in

4    your heart?

5        A    No.

6        Q    He didn't say, I'll put a bullet in your brain?

7        A    No.

8        Q    He didn't say, I'll bust a cap in your ass and then

9    you'll be dead?

10       A    No.

11       Q    He didn't say, I'm going to kill you?

12       A    No.

13       Q    He didn't say, I'm going to murder you?

14       A    Correct.

15       Q    Okay.  He just used this one slang term?

16       A    Correct.

17            MR. KRUEGER: Nothing further, Your Honor.  Thank you.

18            THE COURT: Ms. Wood, any other questions?

19            MS. WOOD: No, sir.

20            THE COURT: Can Mr. Bruce be excused?

21            MS. WOOD: Your Honor, we would ask that he not be

22       excused until the conclusion of the case in case he's

23       needed.

24            THE COURT: All right.  If you'd go back to the

25       witness room.

1          WITNESS: Thank you, sir.

2          THE COURT: Call your next witness.

3          MS. WOOD: Call Michael Varnum.

4                     **MICHAEL VARNUM,**

5    HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

6    FOLLOWS:

7                     DIRECT EXAMINATION

8    BY MS. WOOD:

9          Q    Tell us your name, please, sir.

10         A    Mike Varnum.

11         Q    And you live here in Lowndes County?

12         A    I do.

13         Q    And were you living, residing in Lowndes County on

14   June the 6th of 2012?

15         A    I was.

16         Q    Did you live at Tremont Villa apartments?

17         A    I did not.

18         Q    Were you present at Tremont Villa apartments that

19   day?

20         A    Yes.

21         Q    How were you -- well, why were you there?

22         A    I was visiting a friend.  Had gotten off of work and

23   was just hanging out.

24         Q    And where were you hanging out?

25         A    On his balcony.

1      Q     And this is a -- I haven't shown you this, but this
2   is an aerial photograph that's been admitted into evidence of
3   the apartment complex.  Do you recognize where your friend's
4   apartment would be?
5      A     If I could find the front gate, then I could.  I
6   can't tell where it's at.
7      Q     Right there.  That's been identified as the front
8   gate.
9      A     Okay.  Then, yes.
10     Q     Is it one of these apartments right here?
11     A     No.  It's actually just to the right of the gate.
12  Right there.
13     Q     Right here?
14     A     Yeah.
15     Q     That's where you were?
16     A     Yes, ma'am.
17     Q     Okay.  And you were sitting out on the balcony facing
18  the gate?
19     A     Right.
20     Q     All right.  And if you would -- obviously something
21  happened that drew your attention to the gate.
22     A     Yeah.  There was a guy in a bigger truck trying to
23  get in.  It was clear he didn't live there because he was
24  waiting on someone to let him in, but I guess someone behind
25  him in a smaller car did live there and was trying to get in

1    and was pretty irritated and just did a lot of yelling, honking
2    the horn, that kind of thing.  Finally, the guy in the truck
3    backed up and let him through.
4         Q    Okay.  I'm going to slow you down and back you up
5    just a little bit.
6         A    Okay.
7         Q    You said the person in the green truck -- well, first
8    of all, did you know either of these two people?
9         A    I did not.
10        Q    The person in the green truck was at the gate
11   waiting?
12        A    Right.
13        Q    Was he blocking the person in the small, white car
14   from entering the property?
15        A    Yeah, he wouldn't have been -- the guy in the car
16   wouldn't have been able to get in because the guy in the truck
17   was there, so I guess he was just having to wait, but I don't
18   think he wanted to wait.
19        Q    How did he indicate to you or you know that he did
20   not want to wait for whoever was going to let in the truck?
21        A    A lot of cursing and really honking the horn a lot,
22   yelling, expletives.
23        Q    Okay.  And this was coming from who?
24        A    The guy in the small car, the little white car.
25        Q    During this exchange, did you hear both gentlemen?

1      A    No, not really.  I couldn't hear the guy in the
2  truck.  I didn't really hear him say anything.  The only reason
3  I heard -- I could hear what the other guy was saying is
4  because he was yelling.
5      Q    All right.  And what happened after that started when
6  they were yelling?
7      A    The guy kept yelling at him and finally the guy in
8  the truck kind of backed up a little bit, so I guess the guy
9  could finally get through.  And the guy got through and then
10 almost like stopped his car on the inside of the gate to
11 prevent the guy in the truck from actually getting in.  And I
12 think at that point the guy in the truck was a little
13 irritated, but he wasn't yelling or anything and that was when
14 the guy told him not to come into the property.
15     Q    Did he make any threats towards him?
16     A    He told him if he came in here he was going to bust a
17 cap in him.
18     Q    And have you heard that phrase before?
19     A    Yeah.
20     Q    And what does that mean to you?
21     A    It usually means you're going to shoot someone.
22     Q    And, during this whole time, did you hear -- you did
23 not hear the gentleman in the truck?
24     A    Not really, no.
25     Q    Okay.  The gentleman in the white car, what was he --

1    what kind of language was he using?

2        A    He was using a lot of, a lot of expletives.  I think

3    the guy in the truck's girlfriend came out, and he started

4    cursing at her as well.  And I think it wasn't until that point

5    that the guy that was in the truck actually started to get a

6    little irritated, but just a lot of cursing.

7        Q    So was the F word used?

8        A    You know, I don't know.  I don't remember

9    specifically.

10       Q    Okay.  But you remember that there was a lot of

11   cursing?

12       A    Yeah.

13       Q    And did you stay on the balcony the entire time?

14       A    No.  Before the gate even opened, my friend and I saw

15   what was happening and, you know, it was clear that it was

16   going to escalate, so we actually walked down into the parking

17   lot and kind of stood off to the side and watched everything

18   transpire.

19           MS. WOOD: Your Honor, that's all I have.  No, I'm

20       sorry.

21   BY MS. WOOD:

22       Q    You were visiting someone, you said, in the apartment

23   complex?

24       A    Yes.

25       Q    And how did you gain entry into the complex?

1      A     Well, because his apartment was so close to the gate,

2    instead of him actually having to buzz me in, he could do it

3    from his balcony as well.  And, so, I would just call him

4    whenever I would arrive, and he would buzz me in and I would

5    drive in.

6         Q     So you had to be let into the apartment?

7         A     Yes.

8         Q     And he pushed a clicker to let you in?

9         A     Yeah.  Normally you -- the only reason it worked like

10   that with him is just because his balcony overlooked the gate.

11   It was right there.

12              MS. WOOD: Thank you.

13              THE COURT: Mr. Krueger?

14              MR. KRUEGER: I have no questions for the witness,

15         Your Honor.

16              THE COURT: All right.  Can Mr. Varnum be excused?

17              MS. WOOD: Yes, sir, with our thanks.

18              THE COURT: Thank you, sir.  You are free to go.

19                    (WITNESS EXCUSED.)

20              THE COURT: Call your next witness.

21              MS. WOOD: Sean Bolan

22                         **SEAN BOLAN,**

23   HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

24   FOLLOWS:

25                    DIRECT EXAMINATION

BY MS. WOOD:

Q    Tell us your name, please, sir.

A    Sean Bolan.

Q    And you live here in Lowndes County?

A    Yes, ma'am.

Q    And on June the 6th of 2012, did you live on Pineview Drive in Apartment B-8?

A    Yes, ma'am, Tremont Villas.

Q    And that evening, were you at your apartment?

A    Yes, ma'am.

Q    And who was with you?

A    My friend, he was my co-worker, Michael Varnum.

Q    All right.  And what were y'all doing?

A    At the time, I think we were just hanging out.  At the time of the incident, we were on my back balcony smoking a cigarette.  My balcony overlooked the entrance to the apartment complex.

Q    And, at some point, something happened to draw your attention to the gate?

A    Yeah.  We heard some yelling.  We were sitting there talking and heard, you know, just some loud noises.  So we look over and we see two cars parked in front of the gate or one is like right in front of the gate waiting for it to open and --

Q    Okay.  What kind of car is right in front of the gate?

1      A     A green truck.  And then a white car pulls behind it,

2   and the guy in the white car starts like yelling, cursing at

3   the guy in the green truck because apparently the guy in the

4   green truck didn't live there, but the guy in the white car

5   did, and he wanted to get in, but he was being blocked at the

6   moment.

7      Q     And that's what you got from the gist of the yelling

8   and the cursing?

9      A     Yeah.  I remember specifics if you would like me

10  to --

11     Q     Yeah, but we'll get to that in just a second.

12     A     Okay.

13     Q     When you were hearing all this yelling, were you

14  hearing both parties?

15     A     No, I didn't hear anything -- I couldn't hear

16  anything from the green truck, only from the white vehicle.

17     Q     All right.  And what did you do when you and Mr.

18  Varnum heard all of this?

19     A     Well, it sounded like it could have gotten pretty

20  serious, and we were worried about somebody getting hurt.  So

21  we decided to walk down towards the entrance, so there were,

22  you know, two more people out there just to try to deter

23  anything from happening.

24     Q     And, when you got downstairs, what did you see?

25     A     Well, at that point, he had gotten inside the gate

1  already.

2      Q    Who is he?

3      A    The white vehicle had gotten inside.  I guess the

4  green truck had gotten behind him at some point, had backed up,

5  and then he was -- the guy in the white car was then yelling at

6  the girlfriend of the guy in the green truck because, like, she

7  couldn't let him in fast enough.

8      Q    And was there any profanity being used?

9      A    There was quite a bit.

10     Q    All right.  And, again, did you hear -- during all

11 this time period, where was the profanity coming from that you

12 heard?

13     A    The white vehicle.

14     Q    And what types of words were being used?  I know --

15 we all know -- everybody is ready for them, just so you know.

16     A    All right.  It was just like mother f-er, ass hole.

17 The girlfriend, he called her a B word.  Just, I mean,

18 everything and anything.

19     Q    And that was all from the gentleman in the white car?

20     A    Yes, ma'am.

21     Q    Okay.  Did you at any point hear -- I'm sorry,

22 scratch that.  Did you know either one of these gentlemen?

23     A    No, ma'am.

24     Q    And you were residing there at the time?

25     A    Yes, ma'am.

1     Q     And you had a signed lease and all that kind of
2     stuff?
3     A     Uh-huh (affirmative response).
4     Q     That was a yes?
5     A     Yes, I had signed a lease.
6     Q     To your knowledge, was Mr. Woodruff in any way
7     employed by the apartment -- that's the gentleman seated over
8     there -- employed by the apartment complex as security or some
9     other way to maintain the order of the apartment complex?
10    A     Not that I'm aware of at all.
11    Q     Okay.  And did you hear any threats made towards
12    anyone?
13    A     Yes, ma'am.  The gentleman in the white car yelled to
14    the gentleman in the green truck that if he saw him in here
15    again, in the apartment complex, he was going to bust a cap in
16    his ass.
17    Q     Okay.  And have you ever heard that phrase before?
18    A     Yes.
19    Q     And what does that mean to you?
20    A     To me that means that you're going to get shot.
21    Q     All right.  And, other than writing statements for
22    the police, did you have any further involvement?
23    A     No.
24    Q     Until today.
25    A     No, ma'am.

```
 1              MS. WOOD: Thank you.  That's all I have.

 2              THE COURT: Mr. Krueger?

 3              MR. KRUEGER: No further questions, Your Honor.

 4              THE COURT: Can Mr. Bolan be excused?

 5              MS. WOOD: Yes, sir, with our thanks.

 6              THE COURT: Thank you, sir, you are free to go.

 7                          (WITNESS EXCUSED.)

 8              THE COURT: We'll take about a ten minute break.  You

 9         can go out and be at ease.

10    NOTE:      (Jury out at 10:42 a.m. A short break was taken,

11               after which the following transpired:)

12              THE COURT: Ms. Wood, who is your next witness?

13              MS. WOOD: Bradline Melton.  She's here in the

14         courtroom, Judge.

15    NOTE:      (Jury in box at 11:07 a.m.)

16              THE COURT: Ms. Wood, you can call your next witness.

17              MS. WOOD: Call Ms. Bradline Melton.

18                       **BRADLINE MELTON**,

19    HAVING FIRST BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS

20    FOLLOWS:

21                       DIRECT EXAMINATION

22    BY MS. WOOD:

23         Q    Can you tell us your name, please, ma'am?

24         A    Brady Melton.

25         Q    And, Ms. Melton, what do you do for a living now?
```

1      A    I'm a nurse.

2      Q    A registered nurse?

3      A    Yes.

4      Q    Okay.  And on June the 6th of 2012, were you a nurse

5  at that point?

6      A    No, I was studying.  I was in nursing school

7  currently.

8      Q    Okay.  And where did you live?

9      A    In Tremont Villas apartment.

10     Q    That's here in Lowndes County, correct?

11     A    Yes.

12     Q    And on June the 6th of 2012, were you at your

13  apartment that evening?

14     A    Yes, I was.

15     Q    And who was with you?

16     A    Just me at the time.  I was studying.

17     Q    And were you expecting someone to come visit?

18     A    Yes, I was, Marty.

19     Q    Who?

20     A    Marty Bruce, my boyfriend at the time.

21     Q    Okay.  And how long had you been living at that

22  apartment at that time?

23     A    At least a year.  I lived there for about three years

24  total.

25     Q    And, during that time period where you had been

1  dating Mr. Bruce, would he come to the apartment?

2      A    Yes.

3      Q    In work clothes?

4      A    Yes.

5      Q    Would he come in civilian clothes?

6      A    Yes.

7      Q    Were you familiar with Mr. Woodruff prior to June the

8  6th of 2012?

9      A    Yes.

10     Q    How did you know him?

11     A    He lived next door to me.

12     Q    And had you -- well, I guess, how well did you know

13  him?

14     A    I knew who he was.  I knew that he was a professor.

15  He had come to my door a couple of times wishing to speak with

16  Marty.  He said he had questions regarding guns and stuff like

17  that.  But a casual hello, but not much.  I kind of stayed to

18  myself.

19     Q    And on June the 6th of 2012, you said you were

20  studying?

21     A    Yes.

22     Q    And you were expecting Marty?

23     A    Uh-huh (affirmative response).

24     Q    Did you -- what was the first thing you remember?

25     A    I usually -- I didn't have a phone, a land line for

1   the gate to be opened, but my remote worked from my door.  And
2   I realized -- I looked down and my phone had froze, so I
3   figured he might have been at the gate.  I looked out the
4   window and saw that he was, so I stepped outside the door to
5   let him in and that's when I saw John's car behind him.  Marty
6   was trying to back up, and I could hear them kind of speaking,
7   so I was trying to make my way down to the gate.  And, as I
8   did, John pulled through and stopped and would not let Marty
9   come any further.  The gate started to close, and I asked him
10  to please pull his car forward, sorry that my, you know, remote
11  was not working, and he was very aggressive in speaking to me.
12       Q    What do you mean by that?
13       A    He just was very hostile --
14            MR. KRUEGER: Your Honor, I object.  This is
15       irrelevant to either of the counts in the indictment.  Ms.
16       Melton is not named as a victim in the indictment.  This
17       testimony has no bearing at all on any of the elements of
18       either charge as indicted.
19            THE COURT: Ms. Wood?
20            MS. WOOD: Your Honor, it certainly goes to the
21       disorderly conduct issue.
22            MR. KRUEGER: Your Honor, the disorderly conduct count
23       identifies a particular phrase that was allegedly spoken
24       by Mr. Woodruff to Deputy Bruce before Ms. Melton got down
25       to the parking lot to witness any conversation between the

1        two of them.

2            THE COURT: All right.  Well, this was part of the

3        continuing incident, so I think it's relevant to what

4        happened that evening, so I'll overrule it.

5            MR. KRUEGER: Thank you.

6    BY MS. WOOD:

7        Q    So, let me make sure I understand, you tried the

clicker from your gate -- from your porch balcony, it didn't

9    work, so you walked downstairs --

10       A    Yes.

11       Q    -- to the parking lot.  And, by that time, you had

12   seen Mr. Woodruff pull up, but blocked the entrance for Mr.

13   Bruce?

14       A    Yes.

15       Q    Is that when you approached mister -- who did you --

16   what did you do next?

17       A    I was near John's car, and I, you know, asked him to

18   please pull forward and that's when he, like I said -- he was

19   talking to me, and he said that I needed to instruct my

20   visitors on the rules and regulations of entering the property

21   correctly.  I don't know the exact words.  It's been awhile.

22   But he used profanity while speaking to me and continued just

23   to not pull forward.  The gate would start trying to close on

24   the truck.  I then got a little bit more -- I told him to move

25   his car forward and then he used more profanity at me and

1    finally drove off.

2         Q     And, again, you had spoken with him before?

3         A     Like I said, no in depth conversations, but a little

4    bit.

5         Q     Who had spoken to him -- of the two of you, who had

6    spoken with him more, you or Marty?

7         A     Marty.

8         Q     And what kind of car -- do you remember what kind of

9    car he was driving?

10        A     Who?

11        Q     John.

12        A     It was a smaller car, maybe a Toyota, a little sedan.

13   I'm not sure of the make and model.

14        Q     White?

15        A     Uh-huh (affirmative response).

16        Q     Okay.  And the gentleman that was driving that white

17   car that blocked the gate that made those statements to you, do

18   you see him here in court today?

19        A     Yes.

20        Q     Could you point him out, please?

21        A     Sitting right there.

22        Q     And could you describe -- well, this is going to be

23   hard --

24              MR. KRUEGER: Different shirts.

25   BY MS. WOOD:

1          Q    Okay.  What color shirt does he have on?

2          A    A white one.

3               MS. WOOD: Your Honor, let the record reflect this

4          witness has identified the Defendant, please.

5     BY MS. WOOD:

6          Q    After this incident, did you have any other issues

7     regarding Mr. -- actually, you know what, I'm going to withdraw

8     that.  Strike that, please.

9               MS. WOOD: That's all I have.

10              THE COURT: Mr. Krueger?

11              MR. KRUEGER: I have no questions for the witness,

12         Your Honor.

13              THE COURT: Can Ms. Melton be excused?

14              MS. WOOD: Yes, sir.

15              THE COURT: Thank you, Ms. Melton, you are free to go.

16                        (WITNESS EXCUSED.)

17              THE COURT: Call your next witness.

18              MS. WOOD: The State would rest, Your Honor.

19              THE COURT: Let me see counsel at the bench.

20    NOTE:     (A conference ensued at the Bench between the Court

21              and counsel, after which the following transpired:)

22              THE COURT: Ladies and gentlemen, it's a little bit

23         early for lunch, but the State has rested.  I don't

24         anticipate the Defense case will last very long, so I'm

25         going to send you to lunch a little bit early.  When you

1      get back, we'll have closing arguments and then I'll

2      instruct you on the law.

3           Again, do not begin discussing the case at this

4      point.  This is not the appropriate time to do that.  Wait

5      until you get back from lunch, hear the closing arguments,

6      then I'll instruct you on the law.  Will 1 o'clock be

7      okay?

8           (Affirmative responses from the jurors.)

9           THE COURT: That will give you plenty of time, I

10     think.  If you'll just be back in the jury room at 1

11     o'clock, we'll proceed with the trial at that time.  Let

12     me caution you again that you're not to discuss the case

13     among yourselves or with anyone else or allow anyone to

14     discuss it with you.  I haven't looked at the paper today,

15     but don't read anything in the paper about this, don't

16     watch any news reports that may relate to this.

17          Any other words of caution before we let the jury go

18     to lunch?

19          MS. WOOD: No, sir.

20          MR. KRUEGER: Nothing.

21          THE COURT: All right.  If you'll be back at 1

22     o'clock.

23     NOTE:      (Jury out at 11:18 a.m.)

24          THE COURT: All right.  Mr. Krueger, you indicated a

25     minute ago at the bench conference that you didn't

1    anticipate calling any witnesses, and I guess you still

2    were discussing with Mr. Woodruff whether he's going to

3    testify or not.  Is that correct?

4         MR. KRUEGER: I don't intend to call any witnesses,

5    and I don't expect that Mr. Woodruff will be testifying.

6         THE COURT: All right.  Mr. Woodruff, certainly you

7    understand that you have a right to testify if you want

8    to?

9         DEFENDANT WOODRUFF: I do.

10        THE COURT: You also have a right to remain silent.

11   You don't have to say anything if you don't want to.

12   That's totally your call after consulting with your

13   attorney.  You understand that, don't you?

14        DEFENDANT WOODRUFF: Yes, sir, I understand it's my

15   right.  At this time, we don't expect to testify, but I'm

16   not sure we've made that final determination.

17        THE COURT: Okay.  Well, that's fine.  That's your

18   decision.  If you change your mind, you can certainly

19   testify at 1 o'clock when the jury gets back.

20        Anything else you want to put on the record about

21   that, Mr. Krueger?

22        MR. KRUEGER: Not as far as Mr. Woodruff's decision to

23   testify or not is concerned.  I would like to make a

24   Motion for Directed Verdict at this time.

25        THE COURT: Okay.  Go ahead.

1              MR. KRUEGER: With respect to Count 1, the indictment

2       specifically alleges that Mr. Woodruff threatened to

3       commit murder and that is the act that gives rise to the

4       charge of Terroristic Threats.  It's my position that

5       there is a fatal variance between what's in the indictment

6       and the evidence that has actually emerged at trial.

7       Three different witnesses testified to being familiar with

8       the phrase, "I'll bust a cap in your ass."  When asked

9       what that means, none of these witnesses equated it with

10      murder.  Each of the witnesses said it means to shoot

11      somebody, which is generally aggravated assault.  Shooting

12      someone is not the equivalent of committing murder.

13      Threatening to shoot someone is not the equivalent of

14      threatening to murder someone.  I don't think that any

15      reasonable juror could conclude otherwise and ask the

16      Court to grant the Motion with respect to Count 1.

17           With respect to Count 2, a key element of that

18      charge, disorderly conduct, is that statements were made

19      without provocation.  I think the evidence has shown from

20      Mr. Bruce's own testimony that there was plenty of

21      provocation involved on Mr. Bruce's part and ask the Court

22      to grant the Motion as to Count 2.

23           THE COURT: All right.  Ms. Wood?

24           THE COURT: Your Honor, I would argue that basically

25      all of that is jury questions and questions of fact for

1          the jury.  Whether or not threatening to shoot someone can

2          be interpreted as murder, as threatening to kill them,

3          certainly would be a jury question.  You know, it

4          certainly was interpreted by Deputy Bruce, who testified

5          that way, that that's how he took it.  And, so, we would

6          argue that the jury should hear that and it should go to

7          the jury on that issue.

8               As far as the disorderly conduct, Your Honor, the

9          evidence -- despite the fact that Mr. Bruce may have

10         responded using profanity to Mr. Woodruff, the evidence

11         has been -- it's been by three witnesses, not just one

12         that the incident was started by Mr. Woodruff.  The two

13         independent witnesses, Your Honor, never heard Mr. Bruce

14         during the whole thing, but they did hear -- Mr.

15         Woodruff's voice was raised, he was yelling, and they did

16         hear him using profanity.  So, we would argue that there's

17         sufficient evidence to present both counts to the jury.

18              THE COURT: Mr. Krueger, you've got the concluding

19         argument.

20              MR. KRUEGER: Your Honor, I would just refer the Court

21         to the case of (inaudible).

22              COURT REPORTER: I'm sorry, I didn't understand you,

23         Mr. Krueger.

24              MR. KRUEGER: I'm sorry.  It's Milner v. State, 297

25         Georgia Appeals 859.  It's a 2009 case.  In that case,

1      similar to this one, the indictment alleged that the

2      defendant threatened to commit murder for the purpose of

3      terrorizing the victim.  The evidence showed that the

4      defendant threatened both to hurt the victim and to bury

5      or kill her.  The Court found that it was probable that

6      the jury convicted the defendant of threatening the victim

7      with bodily harm and found that without a remedial

8      instruction that it was probable that the jury had found

9      that the defendant committed terroristic threats in a

10     manner not consistent with the indictment.

11  NOTE:     (Document is displayed to opposing counsel.)

12          MS. WOOD: Judge, I'm not familiar with Milner, so

13     I'll have to take a look at that during the lunch break.

14          THE COURT: Okay.  Well, I'll look at it.

15  NOTE:     (Document is handed up to the Court.)

16          THE COURT: I've read that case, Mr. Krueger, and I

17     think that it -- I agree with you to the point that I

18     think the Court would have to give a specific instruction,

19     that the jury would have to find from what was said that

20     the crime of murder is being threatened.  I agree with you

21     on that.  But, I don't think it's such a fatal variance

22     with Count 1, the way it's charged, in order to warrant a

23     directed verdict being granted.

24          As far as Count 2 is concerned, I think that whether

25     there was provocation by Mr. Bruce would be a question for

1      the jury to decide based on the evidence in the case.  So,
2      the Court finds there has been sufficient evidence by the
3      State in order for the case to go to the jury.
4           So, the Court is going to deny the Motion for
5      Directed Verdict as to Count 1 and Count 2.
6           MR. KRUEGER: I would just note my exception for the
7      record, and just going to renew those motions and all
8      motions at this point.
9           THE COURT: That will be fine.  Now, as far as the
10     charge goes, of course, I'm going to give all the standard
11     charges and then charge both offenses.
12          And, Mr. Krueger, I'm assuming you are asking for
13     some kind of limiting charge on Terroristic Threats, that
14     it has to be directed toward the -- the jury would have to
15     find that the statements made by the Defendant, if they
16     find that he made those statements, would have to be a
17     threat of murder, not just bodily harm.
18          MR. KRUEGER: Right.  Yeah, not any crime of violence.
19          THE COURT: And I agree.  I think under the Milner
20     case that would be accurate.  So, I intend to do that.
21     Any other charges that you want, Wade?
22          MR. KRUEGER: I don't have any other special jury
23     instructions outside the pattern charges.
24          THE COURT: Does the State have anything else?
25          MS. WOOD: No, sir.

1          THE COURT: Okay.  Well, I'll give all the standard

2     stuff, you know, presumption of innocence and burden of

3     proof, all of that.  I mean, that will be covered.

4          The only thing that comes up sometimes -- there were

5     no statements apparently to the police that we need to be

6     concerned about.  Nobody has testified to a statement and

7     there's no impeachment-type charges that I can see.

8          MR. KRUEGER: No, nothing.

9          MS. WOOD: (Nods head negatively.)

10          THE COURT: All right.  Well, if y'all think of

11     something else let me know when we get back at 1 and I'll

12     be glad to consider it.  We'll be in recess until 1

13     o'clock.

14   NOTE:     (Court was recessed at 11:27 a.m. and a lunch break

15             was taken, after which the following transpired:)

16          THE COURT: Ms. Wood, Mr. Krueger, are we ready to

17     proceed?

18          MS. WOOD: Yes, sir.

19          MR. KRUEGER: Your Honor, I consulted further with Mr.

20     Woodruff about whether he wished to testify.  He has

21     informed me that he does not wish to testify.

22          THE COURT: All right.  So, once we call the jury in,

23     you're going to rest?

24          MR. KRUEGER: Yes, sir.

25          THE COURT: Are y'all ready to go forward with your

1     closing arguments?

2          MS. WOOD: Yes, sir.

3          THE COURT: All right.  We're ready.

4   NOTE:     (Jury in at 1:06 p.m.)

5          THE COURT: Mr. Krueger, the State has rested.  At

6     this time, the Defense can call their first witness.

7          MR. KRUEGER: The Defense rests, Your Honor.

8          THE COURT: Both sides are closed then?

9          MS. WOOD: Yes, sir.

10         MR. KRUEGER: Yes, Judge.

11         THE COURT: Ladies and gentlemen, at this time the

12    attorneys will make their closing arguments.  Let me

13    remind you that the closing arguments are like the opening

14    statements in that what the lawyers are about to say to

15    you is not the evidence.  You've heard the evidence during

16    the course of the trial.  But it's an attempt by each side

17    to summarize the case for you and to tell you what they

18    think the evidence in the case has shown.

19         Ms. Wood, the State will have the opening and

20    concluding argument.

21         MS. WOOD: Your Honor, we'll waive opening and reserve

22    concluding, please.

23         THE COURT: All right.  Mr. Krueger?

24         MR. KRUEGER: Thank you, Your Honor.

25   NOTE:     (Closing arguments were made by Mr. Krueger for the

1              Defense, followed by Ms. Wood for the State without
2              any objection being made by either side.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25              (CHARGE OF THE COURT FOLLOWS ON PAGE 56.)

1

2

3

## CHARGE OF THE COURT

4

5                    THE COURT: Members of the jury, the Defendant in this

6          case, John Michael Woodruff, stands indicted by the Grand

7          Jury of Lowndes County in a two-count indictment for

8          Terroristic Threats and Disorderly Conduct.  An indictment

9          was returned by the Grand Jury on July 27th of 2012. That

10         indictment reads as follows:

11                    In the Superior Court of Lowndes County, State of

12         Georgia, the Grand Jurors selected, chosen, and sworn for

13         the County of Lowndes, whose names are listed on this

14         indictment, Count 1, the Grand Jurors aforesaid on their

15         oaths aforesaid in the name and behalf of the citizens of

16         Georgia, charge and accuse John Michael Woodruff with the

17         offense of Terroristic Threats, for that the said accused

18         in Lowndes County, Georgia, on or about the 6th day of

19         June, 2012, then and there did threaten to commit murder,

20         a crime of violence, with the purpose of terrorizing Marty

21         A. Bruce, contrary to the laws of said State, the good

22         order, peace, and dignity thereof.

23                    Count 2, the Grand Jurors aforesaid on their oaths

24         aforesaid in the name and behalf of the citizens of

25         Georgia, charge and accuse John Michael Woodruff with the

           offense of Disorderly Conduct, for that the said accused

           in Lowndes County, Georgia, on or about the 6th day of

June, 2012, then and there did, without provocation, in
the presence of Marty A. Bruce, use to said person
opprobrious and abusive words that are listed in the
indictment, said words, which by their very utterance tend
to incite an immediate breach of the peace and are words
which, as a matter of common knowledge and under ordinary
circumstances, will, when used to another person in such
other person's presence, naturally tend to provoke violent
resentment and are words commonly called fighting words,
contrary to the laws of said State, the good order, peace,
and dignity thereof.

Now, to this indictment, the Defendant has entered
his plea of not guilty to these charges, thereby denying
each and every material allegation of the indictment and
forming the issue which you have been sworn and impaneled
to try and determine.  I charge you that neither the
indictment returned by the Grand Jury nor the plea of not
guilty entered by the Defendant are evidence and they're
not to be taken by you as evidence.  They are merely the
way in which these charges come here to the Superior Court
for trial. I caution you that the fact that this accused
has been indicted by the Grand Jury is no evidence of his
guilt.

Now, under our law, everyone is presumed to be
innocent until proven guilty.  Our law says that every

1    person enters upon the trial of a case with a presumption

2    of innocence in his favor and that that presumption

3    surrounds him and protects him unless and until it is

4    overcome by the State with evidence from the witness stand

5    which is sufficient to convince you as the jury of the

6    guilt of the Defendant beyond a reasonable doubt.  Our law

7    says that no person shall be convicted of any crime unless

8    and until each element of the crime is proven to the

9    satisfaction of the jury and beyond a reasonable doubt.

10         I charge you that the object of all legal

11    investigation is the discovery of the truth, and the

12    burden of proof rests upon the State to prove every

13    material allegation of the indictment and every essential

14    element of the crimes charged to your satisfaction and

15    beyond a reasonable doubt.  There is no burden of proof on

16    the Defendant whatsoever, and the burden of proof never

17    shifts to the Defendant to prove his innocence.  However,

18    the State is not required to prove the guilt of the

19    Defendant beyond all doubt or to a mathematical certainty.

20         A reasonable doubt means just what it says.  It is a

21    doubt of a fair-minded, impartial juror honestly seeking

22    the truth.  It is a doubt based upon common sense and

23    reason.  It does not mean a vague or arbitrary or

24    capricious doubt, but it is a doubt for which a reason can

25    be given arising from the evidence, a lack of evidence, a

1       conflict in the evidence, or any combination of these.

2           If, after giving consideration to all the facts and

3       circumstances of this case, your minds are wavering,

4       unsettled, or unsatisfied, then that is a doubt of the

5       law, and you should acquit the Defendant.  However, if

6       this doubt does not exist in your minds as to the guilt of

7       the Defendant, then you would be authorized to convict the

8       Defendant.  If the State fails to prove the Defendant's

9       guilt beyond a reasonable doubt, it would be your duty to

10      acquit the Defendant.

11          The law provides that criminal actions such as this

12      shall be tried in the county in which the crime was

13      committed.  Venue, that is, that the crime was committed

14      in Lowndes County, is a jurisdictional fact that must be

15      proven by the State beyond a reasonable doubt as to each

16      crime charged in the indictment, just as any other element

17      of the offense.  Venue may be proved by direct or

18      circumstantial evidence or both.

19          I charge you that in a criminal case such as this,

20      you are the judges of both the law and the facts.  The law

21      you get from the Court as given you in this charge, the

22      facts you get from the witnesses who testify, and to the

23      one you apply the other.  The Charge of the Court is the

24      law of the case and by that you are bound, except that you

25      are the judges of this law in applying it to the facts as

1    you find them to be.

2        Now, members of the jury, you're made by the law the

3    sole and exclusive judges of the credibility of the

4    witnesses.  That just means it's for you to determine

5    which witnesses you will believe and any witnesses you

6    will disbelieve, if there are any.  In deciding upon their

7    credibility, you may consider all the facts and

8    circumstances of the case, the witness' manner of

9    testifying, their interest or lack of interest in the

10   case, their means and opportunity for knowing the facts to

11   which they testify, the nature of those facts, the

12   probability or improbability of their testimony and of the

13   occurrences to which they testify.  You may also consider

14   their personal credibility insofar as it may legitimately

15   appear to you from the trial of this case.

16       If, upon a consideration of the evidence in this

17   case, you find that there is a conflict between the

18   testimony of a witness or a conflict between a witness and

19   other witnesses, it becomes your duty to reconcile this

20   conflict, if you can, without imputing perjury to anyone.

21   Now, if you cannot do that, it becomes your duty to

22   believe that witness or those witnesses you think best

23   entitled to belief.  In deciding this, you may consider

24   their bias or prejudice if any appears, the reasonableness

25   or unreasonableness of the statements they make, their

1    familiarity with the facts about which they testify, and,

2    again, their personal credibility.

3        Now, members of the jury, I charge you that the

4    Defendant in a criminal case is under no duty to present

5    any evidence tending to prove innocence and is not

6    required to take the stand and testify in the case.  If

7    the Defendant elects not to testify, no inference hurtful,

8    harmful, or adverse to the Defendant shall be drawn by the

9    jury, nor shall such fact be held against the Defendant in

10   any way.

11       Now, this Defendant has been charged with two

12   separate offenses that are crimes under the law of our

13   State, and I charge you that a crime is a violation of a

14   statute of this State by a person of sound mind and

15   discretion in which there is a union and joint operation

16   of act and intention.  Intent is an essential element of

17   any crime and must be proven by the State beyond a

18   reasonable doubt.  Intent may be shown in many ways

19   provided that you, the jury, believe that it existed from

20   the proven facts before you.

21       It may be inferred from the proven circumstances or

22   by acts and conduct or it may be, in your discretion,

23   inferred when it is the natural and necessary consequence

24   of the act.  Whether or not you draw such an inference is

25   solely a matter within your discretion.  This Defendant

1    will not be presumed to have acted with criminal intent,

2    but you may find such intention or the absence of it upon

3    a consideration of words, conduct, demeanor, motive, and

4    other circumstances connected with the act for which the

5    accused is being prosecuted.

6        Now, members of the jury, evidence may be either

7    direct or circumstantial or both.  In considering the

8    evidence, you may use reasoning and common sense to make

9    deductions and reach conclusions.  You should not be

10   concerned about whether evidence is direct or

11   circumstantial.  Direct evidence is simply the testimony

12   of a person who asserts that he or she has actual

13   knowledge of a fact, such as an eyewitness.

14   Circumstantial evidence is proof of a set of facts and

15   circumstances that tend to prove or disprove other facts

16   and circumstances by inference.

17       There is no legal difference between the weight that

18   you give either direct or circumstantial evidence.  You

19   would be authorized to convict only if the evidence,

20   whether direct or circumstantial or both, excludes all

21   reasonable theories of innocence and proves the guilt of

22   the accused beyond a reasonable doubt.

23       Now, members of the jury, you are to base your

24   verdict in this case upon the sworn testimony and evidence

25   which is introduced and admitted by the Court for your

1     consideration.  You're not to consider any evidence which

2     was offered and not admitted.  Any statement not under

3     oath made by attorneys for either party is not to be

4     considered by you as evidence.

5          I want to caution and instruct you that anything the

6     Court may have said or done in its rulings or otherwise

7     during the course of this trial was not intended in any

8     way to intimate or hint or suggest to you that the Court

9     was expressing any opinion as to what your verdict should

10    be.  Whatever your verdict will be is a matter for you

11    twelve jurors to determine.  And, if the Court has said

12    anything or done anything that led you to believe the

13    Court was expressing an opinion, I charge you to disregard

14    this entirely.

15         Now, as I said, this Defendant has been charged with

16    two separate offenses under the laws of the State of

17    Georgia.  It becomes important for you to understand the

18    definition of those offenses.  As to Count 1 of the

19    indictment, the charge is Terroristic Threats.  Our law

20    defines that as follows: A person commits terroristic

21    threats when that person threatens a crime of violence

22    with the purpose of terrorizing another.

23         As to this particular charge in this indictment in

24    Count 1, I charge you that in order for the jury to find

25    the Defendant guilty of Terroristic Threats in this case,

1     the jury must find that the language and/or words used by

2     the Defendant were the equivalent of a threat to commit

3     the specific crime of violence of murder as to Marty A.

4     Bruce as alleged in this indictment.

5          As to Count 2, the charge is Disorderly Conduct and

6     Georgia law defines that charge as follows: A person

7     commits the offense of Disorderly Conduct when such

8     person, without provocation, uses to or in such other

9     person's presence opprobrious or abusive words which by

10    their very utterance tend to incite an immediate breach of

11    the peace, that is to say, words which as a matter of

12    common knowledge and under ordinary circumstances will,

13    when used to or in another person's presence, naturally

14    tend to provoke violent resentment, that is, words

15    commonly called fighting words.

16         Now, members of the jury, you will be required to

17    reach a verdict as to both counts, so you need to consider

18    both counts individually and make a separate decision as

19    to each count.

20         As to Count 1, if you believe beyond a reasonable

21    doubt that John Michael Woodruff, the Defendant in this

22    case, in Lowndes County, Georgia, on or about the 6th day

23    of June, 2012, did threaten to commit a crime of violence,

24    specifically murder, with the purpose of terrorizing Marty

25    A. Bruce, then you would be authorized to find the

1    Defendant guilty of Count 1, Terroristic Threats.

2        On the other hand, if you do not believe that he's

3    guilty of that charge or if you have any reasonable doubt

4    as to his guilt as to Terroristic Threats, it would be

5    your duty to acquit him and find him not guilty of Count

6    1.

7        You would then consider Count 2 of the indictment.

8    If you believe beyond a reasonable doubt that the

9    Defendant, John Michael Woodruff, in Lowndes County,

10   Georgia, on or about the 6th day of June, 2012, did then

11   and there without provocation and in the presence of Marty

12   A. Bruce use opprobrious and abusive words, which by their

13   very utterance tended to incite an immediate breach of the

14   peace as set forth in the indictment, then you would be

15   authorized to find the Defendant guilty of Count 2.

16       On the other hand, if you do not believe that he's

17   guilty of Count 2 or if you have any reasonable doubt as

18   to his guilty, it would be your duty to acquit him and

19   find him not guilty of Count 2.

20       Now, members of the jury, at this time and at this

21   stage of the proceedings, you are concerned only with the

22   guilt or innocence of the accused in this case.  Whatever

23   your verdict is in this case, it must be a unanimous

24   verdict.  That means it must be agreed upon by all twelve

25   of you.  It then needs to be dated, entered in writing and

1    signed by one of your members as foreperson of the jury,

2    and then returned and published here in open court.

3         I'm going to send the indictment form out with you.

4    On the second page of the indictment form, there is a pre-

5    printed verdict form.  I have underlined the word

6    "verdict."  It says, "We, the Jury, find the Defendant,

7    John Michael Woodruff," and I have written in Count 1 and

8    Count 2.  On those lines beside those counts, you either

9    need to put not guilty or guilty, whatever you decide as

10   to those two counts.  It will then need to be dated and

11   signed by your foreperson and returned and published here

12   in open court.

13        Now, members of the jury, the evidence in the case is

14   now closed.  You've heard all the evidence, there will be

15   no more evidence submitted by either party or by the

16   Court.  Part of your job as jurors is to remember the

17   evidence and base your decision on the evidence that

18   you've heard during the course of the trial.

19        When I say the evidence is closed, what I mean is

20   that there will be no more evidence.  If you want to have

21   more evidence or if you have questions about the evidence,

22   I cannot reopen the case, I cannot give you anymore

23   evidence, or even answer questions about the evidence.

24   However, if you have any questions or if you are unclear

25   about any of the law that the Court has given you in this

1      charge, I will certainly try to clarify any points of law

2      for you.  If you have any questions along those lines, if

3      you will write those questions down, give it to the

4      bailiff, they'll give it to me, and I will do my best to

5      explain or clarify any points of law that you may have.

6          Now, one of your first duties in the jury room will

7      be to select one of your number who will act as the

8      foreperson of the jury.  This person will preside over

9      your deliberations and sign the verdict to which all

10     twelve of you freely and voluntarily agree.

11        You should start your deliberations with an open

12     mind.  Consult with one another and consider each other's

13     views.  Each of you must decide this case for yourself,

14     but you should do so only after a discussion and

15     consideration of the case with all your fellow jurors.  Do

16     not hesitate to change an opinion if convinced that it is

17     wrong; however, you should never surrender an honest

18     opinion in order to be congenial or to reach a verdict

19     solely because of the opinions of the other jurors.

20        I want to emphasize to you again that the Court's

21     sole interest in this case was that it was fairly

22     presented according to the law and that you, as honest,

23     conscientious, and impartial jurors, return a verdict in

24     this case that speaks the truth, whatever you find the

25     truth to be.

1          At this time, I'm going to ask you to retire to your

2     jury room.  When you get to the jury room, if you'll go

3     ahead and elect your foreperson as soon as you get there.

4     In just a moment, I will send out the indictment, the

5     verdict form, and the -- I think there's just one item of

6     evidence, but I'll send that out in just a moment.  As

7     soon as you get all that, you can begin your

8     deliberations.

9          Ms. Dart and Mr. Ponder, they'll show y'all where to

10    sit when the jury goes to the jury room.

11         If you will retire at this time.

12    NOTE:    (Jury out at 1:45 p.m.)

13         THE COURT: Are there exceptions to the charge from

14    the State?

15         MS. WOOD: No, sir.

16         THE COURT: From the Defense?

17         MR. KRUEGER: No, Your Honor.

18         THE COURT: I think all we've got is State's Exhibit

19    1, which is the aerial map, I believe.

20         MS. WOOD: Yes, sir.

21         MR. KRUEGER: That's all I recall.

22         THE COURT: And, if y'all would, look at that and make

23    sure you don't have any objection to the way I did the

24    verdict form.

25         MS. WOOD: Looks fine to me.

1          MR. KRUEGER: It looks good, yes.

2          THE COURT: Okay.  Amos, if you would, take the

3     indictment and Exhibit 1 out, and they can start

4     deliberating.

5   NOTE:     (Evidence is delivered to the jury.)

6          THE COURT: We will be in recess until the jury comes

7     back in.

8   NOTE:     (Recess at 1:46 p.m. to await the verdict of the

9          jury.)

10          (Jury in box at 2:33 p.m.)

11          THE COURT: Members of the jury, have you reached a

12     verdict?

13          FOREPERSON: Yes, sir, we have.

14          THE COURT: Ms. Gaskins, if you would give it to the

15     Bailiff, please, ma'am.

16   NOTE:     (Verdict handed up to the Court.)

17          THE COURT: The verdict of the jury reads as follows:

18     Case number 2012-CR-717, State of Georgia versus John

19     Michael Woodruff. Verdict: We, the jury, find the

20     Defendant, John Michael Woodruff, Count 1, guilty; Count

21     2, guilty, this 21st day of July, 2015, Lorri Gaskins,

22     Foreperson.

23          Does either counsel want to examine the form of the

24     verdict?

25          MS. WOOD: No, sir, thank you.

1          MR. KRUEGER: No, Your Honor.

2          THE COURT: Ladies and gentlemen, we have selected all

3     of the juries that we're going to need to select this

4     week, so you're now finished with your week of jury

5     service.  You won't have to come back tomorrow or any

6     other time until you get another jury summons, and I don't

7     think that will be too soon.  We want to thank you for

8     your service and for your willingness to be here and for

9     the time and attention you've given this case.  You'll

10    receive your pay for your jury service in about ten days

11    from the Clerk's Office.  If for some reason you don't get

12    it, if you'll contact Ms. Greene or one of the folks in

13    her office, they'll run it down for you.

14          I would ask on your way out today, if any of you had

15    a correction to make on your name, if it's misspelled, if

16    it's wrong, if your address is wrong, if you'll give that

17    to Mr. Spurlock on the way out, he'll give it to me, and

18    we'll make the corrections with the Clerk's Office.

19          Once again, we thank you for your service and you're

20    free to go.  If everyone else would remain seated.

21  NOTE:      (Jury excused at 2:35 p.m.)

22          THE COURT: Mr. Woodruff, the Court is going to

23    request that a pre-sentence investigation be done in your

24    case.  Sentencing will be on Friday, September the 11th at

25    9:30 in the morning in Courtroom Number 1 at the Lowndes

1    County Law Enforcement Complex.  Any information that you

2    want me to review prior to that time, if you'll get that

3    to Mr. Krueger, he'll get it to me.

4        Wade, we'll call the probation office and let

5    somebody come over and talk to him before he leaves.  That

6    way, we won't have to worry about setting up an

7    appointment and all.  They'll just come over here and he

8    can talk to them over here.  He can remain out on bond.

9        MR. KRUEGER: Thank you, Your Honor.

10        THE COURT: We will be in recess.

11

12                  (PROCEEDINGS CONCLUDED.)

13

14

15

16

17

18

19

20

21

22

23

24

25



STATE'S
EXHIBIT

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES

        I hereby certify that the foregoing proceedings were
taken down by me, as stated in the caption, and that the
foregoing pages 1 through 71 represent a true, correct and
complete transcript of said proceedings, and page 72 is a
copy of the exhibit admitted during the proceedings.

        I further certify that I am neither of kin nor
counsel to the parties in this matter, nor am I
financially interested in same.

        This the 21st day of January, 2016.


                                    _____
                                    STEPHANIE P. FUDGE, C.C.R.
                                    Certificate No. B-2419
                                    Official Court Reporter
                                    Southern Judicial Circuit

IN THE SUPERIOR COURT OF LOWNDES COUNTY

STATE OF GEORGIA


STATE OF GEORGIA                    CRIMINAL ACTION,

        VS.                         FILE NO. 2012-CR-717

JOHN MICHAEL WOODRUFF,              CHARGES:
                                    Count 1: Terroristic Threats
            Defendant.              Count 2: Disorderly Conduct

                            **SENTENCING**


                   TRANSCRIPT OF PROCEEDINGS


        The following transpired before the Honorable RICHARD M.

COWART, Judge, Superior Courts, in Courtroom 1 of the Lowndes

County Law Enforcement Complex in Valdosta, Lowndes County,

Georgia, on Friday, September 11th, 2015.


APPEARANCES:

        FOR THE STATE:             MS. LAURA ANDERSON WOOD
                                   Assistant District Attorney
                                   Post Office Box 99
                                   Valdosta, Georgia 31603


        FOR THE DEFENDANT:         MR. GUYTON O. TERRY, III
                                   Attorney at Law
                                   Post Office Box 1185
                                   Valdosta, Georgia 31603

1                           P R O C E E D I N G S

2

3    [Friday, September 11, 2015, at 10:10 a.m. in open court.]

4

5                THE COURT: John Michael Woodruff.

6                MR. TERRY: Good morning, Judge.

7                THE COURT: Good morning.

8           Mr. Woodruff, you were previously in court and the

9      jury entered a guilty verdict in Counts 1 and 2 of Case

10     Number 2012-CR-717.  The Court requested a pre-sentence

11     investigation be done.  That's been completed.  I have

12     reviewed that, along with the pre-sentence submission by

13     your attorney, Mr. Terry.  We're here today for sentencing

14     and prior to that I'll be glad to hear anything else you

15     want to tell me or your lawyer or anybody else on your

16     behalf.

17           MR. TERRY: Your Honor, I would just like to rely upon

18     the submission that was sent on September the 8th.  I

19     would also notify the Court that I did not see the State's

20     pre-sentence submission.  It may have been given to Wade

21     Krueger.  I'm not sure.  I don't know if you've got

22     anything, Judge, that --

23           THE COURT: It looks like from the pre-sentence

24     investigation that he qualified for first offender, and

25     you had requested first offender in your letter.

2

1          MR. TERRY: That's the important part to me, Judge.

2          THE COURT: Mr. Woodruff, you've talked to Mr. Terry

3     about that?

4          DEFENDANT WOODRUFF: I have.

5          THE COURT: Okay.  Do you want the Court to sentence

6     you under the First Offender Act?

7          DEFENDANT WOODRUFF: Yes, I do.

8          MR. TERRY: He has to have your permission to do that.

9     That's why he's asking you.

10          DEFENDANT WOODRUFF: Oh.

11          THE COURT: All right.  Mr. Woodruff, as to Count 1,

12     your sentence will be three years in the state penal

13     system.  As to Count 2, your sentence will be twelve

14     months.  Those sentences will run concurrently for a total

15     of three years.

16          You'll be allowed to serve that sentence on probation

17     under the terms and conditions of the First Offender Act.

18     You'll be under the general conditions of probation with

19     the additional conditions that you pay a $1,000 fine on

20     Count 1, that you pay a monthly probation supervision fee,

21     a $50 crime lab fee, and reimburse Lowndes County for the

22     expenses of a public defender in the amount of $500 plus

23     the application fee.

24          In addition, you will be required to complete 80

25     hours of community service at the direction of your

3

1    probation officer, to not have any contact with the victim

2    or witnesses in this case, to undergo any mental health

3    evaluation or treatment that may be indicated by the

4    probation office, and that you be subject to a search

5    clause.

6         If you want to appeal your conviction in this case,

7    you have to file a Notice of Appeal -- finally, you are to

8    complete an anger management course.

9         If you want to appeal your conviction in this case,

10   you have to file a Notice of Appeal with the Clerk of the

11   Superior Court of Lowndes County within thirty days of

12   today.  If you don't do that, you will lose your right to

13   appeal.

14        Do you understand that?

15        DEFENDANT WOODRUFF: Yes, sir.

16        THE COURT: Any Petition for Habeas Corpus relief from

17   this sentence must be filed within four years from the

18   date the sentence becomes final as to Count 1 and within

19   twelve months as to Count 2.

20        If you will see one of the probation officers.

21        MR. TERRY: Thank you, Judge.

22

23             (PROCEEDINGS CONCLUDED.)

24

25

4

C E R T I F I C A T E

STATE OF GEORGIA

COUNTY OF LOWNDES


     I hereby certify that the foregoing proceedings were
taken down by me, as stated in the caption, and that the
foregoing pages 1 through 4 represent a true, correct and
complete transcript of said proceedings.

     I further certify that I am neither of kin nor
counsel to the parties in this matter, nor am I
financially interested in same.

     This the 21st day of January, 2016.



_____
STEPHANIE P. FUDGE, C.C.R.
Certificate No. B-2419
Official Court Reporter
Southern Judicial Circuit